Pauline E. KNIGHT et al.,

v.

**STATE BOARD OF EDUCATION** et al.

Civ. No. 3129.

United States District Court
M. D. Tennessee,
Nashville Division.

Dec. 16, 1961.

Z. Alexander Looby, Avon N. Williams, Jr., Looby & Williams, Nashville, Tenn., Jack Greenberg, New York City, for plaintiffs.

George F. McCanless, Atty. Gen., Milton P. Rice, Asst. Atty. Gen., for defendants.

WILLIAM E. MILLER, Chief Judge.

In this action the plaintiffs, thirteen negro students of Tennessee A & I State University, challenge upon constitutional grounds their suspension from the University at the end of the 1960–1961 school year. They contend that the action taken by the University through its discipline committee violated the plaintiffs' rights under the equal protection and due process clauses of the Fourteenth Amendment, in that such action was arbitrary, discriminatory, and without either notice to the plaintiffs of the charges against them or opportunity to be heard. It is further insisted that the suspension orders were issued as a punitive or retaliatory measure against the plaintiffs because of their having exercised their alleged constitutional rights by participating in the recent freedom rides in Mississippi to protest the segregation laws and practices of that state at interstate bus terminals and facilities. Such alleged punitive and retaliatory action is said to violate the plaintiffs' rights under the equal protection and due process clauses of the Fourteenth Amendment, independently of the question of procedural due process, and in addition to constitute a prohibited burden on interstate commerce in violation of the commerce clause, thus entitling the plaintiffs to unconditional reinstatement to the University.

Upon consideration of the facts developed by the evidence and the applicable authorities, the Court is persuaded that the plaintiffs' claim to a deprivation of procedural due process is well taken, but that their claim that the disciplinary action taken against them by the University was dictated by a purpose or motive to punish the plaintiffs or as a retaliatory measure for engaging in the freedom rides is without merit and cannot be sustained.

Pertinent and material facts in the controversy are as follows: Tennessee Agricultural and Industrial State University, located at Nashville, was organized as a college or university for negroes but presently is operated on an integrated basis. Its President, its operating and teaching personnel, and most of its students are members of the negro race. It is one of six tax-supported institutions of higher learning in the State under the general management, supervision and control of the State Board of Education. Prior to April 8, 1960, the State Board had not prescribed written or definite rules or regulations for disciplining students at the institutions under its control. Matters of discipline were largely left to each institution, although there is some evidence to indicate that there was a tacit rule or general understanding on the part of the Board that each institution would have the right to dismiss a student summarily for personal misconduct or upon being convicted of a criminal offense involving personal misconduct. Whether or not there was such an unwritten rule, it is clear from the record that it did not receive uniform interpretation by the authorities in control of the various colleges and universities under the jurisdiction of the Board, some schools acting on the assumption that the power to discipline students could be exercised without notice or any kind of hearing and other schools taking the contrary view. This was the posture on April 8, 1960, when the Tennessee Commissioner of Education, in his capacity as Chairman of the State Board of Education, addressed a letter to each of the institutions of higher learning under the Board's jurisdiction formulating a rule governing the disciplining of students for misconduct which was later ratified and approved by the entire Board. The letter of April 8, 1960, reads as follows:

"The necessity for maintaining the integrity and honor of the student body at each of the State colleges and universities under the jurisdiction of the State Board of Education has long been recognized. The misconduct of any student enrolled in an institution of higher learning reflects dishonor and discredit upon the institution in which he is enrolled and upon higher education in general.

"It is for this reason, therefore, that as Chairman of the State Board of Education and acting on behalf of the Board, I am instructing you to dismiss promptly any student enrolled in the institution of which you are president who shall, in the future, be arrested and convicted on charges involving personal misconduct.

"This policy is to be placed into effect immediately."

The regulation so prescribed was construed by the President of Tennessee A & I as requiring prompt and mandatory suspension or dismissal of any student convicted of a criminal offense involving personal misconduct, regardless of whether such conviction may have been appealed to a higher court. This was also the construction placed upon the regulation by the authorities of other schools and by the Chairman of the State Board. The letter of April 8, 1960 was written at the time of the lunch counter demonstrations in the City of Nashville, in which some of the plaintiffs and other Tennessee A & I students participated, protesting the prevailing practice in restaurants and at lunch counters in that city denying service to members of the negro race. As a result of such demonstrations, many students of Tennessee A & I were arrested and convicted for alleged disorderly conduct, but the proof shows that no disciplinary action was taken by the University against any of the student participants under the regulation of April 8, 1960.

In May and June, 1961, the plaintiffs, after completion of their school work for the year, in different groups and at different times, traveled by interstate bus to Jackson, Mississippi, where they entered the waiting rooms of the Greyhound and Trailways Bus Terminals.

When they refused to leave the bus terminals in response to an order from a local police officer, they were arrested, charged with disorderly conduct in violation of a Mississippi statute defining that offense, and later convicted in a Magistrate's Court. Each plaintiff received a fine of $200.00 and a 60-day suspended jail sentence. Each plaintiff spent approximately 30 days in jail pending efforts to post an appeal bond. They were finally successful in perfecting appeals of their convictions to a higher court in Mississippi, which appeals are still pending. On June 1, 1961, a day or so after most of the convictions, but on the same day as one of the convictions and even before one of them, the discipline committee of Tennessee A & I University suspended the plaintiffs from the University after an ex parte hearing, without notice to the plaintiffs, and at a time when they were still in jail in Mississippi pending attempts to post bonds for appeals. On the same date, the committee addressed to the plaintiffs at their local residences in Nashville a letter setting forth the action of the committee as follows:

"In view of the fact that you have been arrested and convicted for violating a Mississippi law and are now in litigation to prove or disprove the validity of that arrest and conviction, and in light of the policy of the State Board of Education that provides for the dismissal of a student from a college or university under its jurisdiction when such student is arrested and convicted of charges involving misconduct, you have been placed on probation and will be denied the privilege of continuing your education at the Tennessee A & I State University. If it is later indicated that you have not violated this policy of the State Board of Education, your case may be reconsidered.[1]

The plaintiffs did not learn of the action taken by the University until their return to Nashville some 30 or 40 days thereafter. They then attempted to protest their suspension to the University authorities and, after a series of demonstrations, obtained an audience with the President of the University in which they were advised that the action taken by the committee was mandatory under the terms of the letter of April 8 by reason of the plaintiffs' convictions in Mississippi and that their only recourse would be to the courts.

The question whether due process requires notice and some opportunity to be heard before students at a state tax-supported college are expelled for misconduct was directly presented in the recent case of Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Circuit), certiorari denied by the Supreme Court. The Court of Appeals for the Fifth Circuit in an elaborate and carefully reasoned opinion emphatically answered the question in the affirmative. While there are factual differences between the Dixon case and the present one, and the principles enunciated so clearly therein are not necessarily determinative of this case, they are entitled to considerable weight insofar as the question of procedural due process is concerned. It was pointed out in the Dixon case that with respect to private colleges and universities the precedents had established the rule that dismissal of students could be effected at any time and for any reason without notice to the student concerned, and without opportunity for a hearing, but that the authorities involving suspension or expulsion from a public college or university all dealt with the question whether the hearing given to the student was adequate, in every instance the court upholding the sufficiency of the hearing. Finding the question not conclusively settled by the authorities, the court proceed-

[1.] In the case of five of the plaintiffs an additional paragraph was added stating that their grades did not meet the minimum academic requirements to continue their work at the University, and that they would receive official notice to this effect from the admissions committee.

ed to apply to the facts of the particular case the criteria articulated by the Supreme Court in Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 644, 95 L.Ed. 817:

"Whether the ex parte procedure to which the petitioners were subjected duly observed 'the rudiments of fair play', * * * cannot * * be tested by mere generalities or sentiments abstractly appealing. The precise nature of the interest that has been adversely affected, the manner in which this was done, the reasons for doing it, the available alternatives to the procedure that was followed, the protection implicit in the office of the functionary whose conduct is challenged, the balance of hurt complained of and good accomplished—these are some of the considerations that must enter into the judicial judgment."

As stated in the later Supreme Court opinion in Cafeteria and Restaurant Workers, etc. v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230, "consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." It was there further stated: "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation. * * * ' "Due process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' It is 'compounded of history, reason, the past course of decisions * * *.' "

■ In the light of these principles, the conclusion appears inescapable upon the present record that the rudiments of fair play and the requirements of due process vested in the plaintiffs the right to be forewarned or advised of the charges to be made against them and to be afforded an opportunity to present their side of the case before such drastic dis-

ciplinary action was invoked by the university authorities. It is undeniable, in the first place, that the plaintiffs in being suspended, although they were given the conditional right to be reinstated if and when their Mississippi convictions should be reversed, were deprived of a valuable right or interest, i. e., the right or interest to continue their training at a university of their choice. As stated in the Dixon case, supra [294 F.2d 157]: "It requires no argument to demonstrate that education is vital and, indeed, basic to civilized society. Without sufficient education the plaintiffs would not be able to earn an adequate livelihood, to enjoy life to the fullest, or to fulfill as completely as possible the duties and responsibilities of good citizens." Indefinite suspension pending the appeals of the Mississippi convictions through the various higher courts with attendant delays and uncertainties might well be for practical purposes the equivalent of outright expulsion.

■ The defendants' argument that the interest which the plaintiffs have in attending a state university is a mere privilege and not a constitutional right was specifically rejected in the Dixon case, and the Court thinks rightfully so. Whether the interest involved be described as a right or a privilege, the fact remains that it is an interest of almost incalculable value, especially to those students who have already enrolled in the institution and begun the pursuit of their college training. Private interests are to be evaluated under the due process clause of the Fourteenth Amendment, not in terms of labels or fictions, but in terms of their true significance and worth. The Court cannot resist the conclusion in the present case that to describe the interest of the plaintiffs in continuing their educations at Tennessee A & I University as a privilege rather than a right, although perhaps accurate for some purposes, is a mere play upon words insofar as the present case is concerned.

■ Considering the nature of the governmental power involved, the conclusion that due process required in the

present case notice to the plaintiffs and an opportunity to be heard is not altered. It may be conceded that a state college or university must necessarily possess a very wide latitude in disciplining its students and that this power should not be encumbered with restrictions which would embarrass the institution in maintaining good order and discipline among members of the student body and a proper relationship between the students and the school itself. It may be further conceded that it is a delicate matter for a court to interfere with the internal affairs and operations of a college or university, whether private or public, and that such interference should not occur in the absence of the most compelling reasons.

Nevertheless, the authorities uniformly recognize that the governmental power in respect to matters of student discipline in public schools is not unlimited and that disciplinary rules must not only be fair and reasonable but that they must be applied in a fair and reasonable manner. Dixon v. Alabama State Board of Education, supra, 294 F.2d at page 157; State ex rel. Sherman v. Hyman, 180 Tenn. 99, 171 S.W.2d 822.

If the regulation of April 8, 1960 means that a student convicted of any criminal offense regardless of its nature and seriousness should be automatically dismissed, and if the regulation so construed should be deemed a reasonable one, then there would be merit in the defendants' argument that the discipline committee was vested with no discretion and that its sole function was to determine whether or not the plaintiffs had actually been convicted of a criminal violation. Since it is admitted that the plaintiffs were so convicted in Mississippi, notice to the plaintiffs and an opportunity to be heard before disciplinary action was taken would have served no useful purpose. But is this the correct construction of the regulation? The Court is satisfied that it is not.

In the first place, the unreasonableness of such a construction argues strongly against it. There are countless convictions for violations of the criminal law which do not necessarily reflect seriously upon the person so convicted. For example, it is inconceivable that the State Board intended in promulgating the regulation of April 8 that a minor traffic violation, such as overtime parking or running a traffic light, would subject a student to summary dismissal without any discretion whatever being vested in the schools involved. Examples of similar technical infractions could be multipled indefinitely, and the Court cannot escape the conclusion that the State Board of Education had in mind a different meaning when the rule of April 8 was adopted. This leads to the question: What is the true meaning of the regulation?

In determining this question, it would appear that the answer is supplied by the letter of April 8 when construed in its entirety. By the express language of the second paragraph, each institution under the jurisdiction of the Board was directed to dismiss promptly, not any student convicted of a criminal charge, but any student convicted on charges "involving personal misconduct." It thus appears that it is not enough for a school to determine the fact of conviction alone but it must go further and find that the charge on which the conviction is based is one which does in fact involve personal misconduct on the part of the student. It must be conceded that the term "personal misconduct" is, generally speaking, a very broad one and, if without definition for a special purpose could embrace any type of behavior in conflict with the criminal law or even with general practice and custom. However, the term as used in the letter of April 8, 1960, is not without definition or limitation. The term "personal misconduct" as used in the second paragraph must be interpreted in the light of the first paragraph of the same letter wherein the purpose in promulgating the regulation is stated as follows: "The misconduct of any student enrolled in an institution of higher learning reflects dishonor and discredit upon the institution in which he is enrolled and upon higher education in

general." In this view the intent of the regulation was not that the schools should summarily dismiss students upon convictions of criminal offenses but only those students convicted of offenses accompanied by personal misconduct of a kind which reflected dishonor and discredit upon the institution. Such a construction not only meets the test of reasonableness, as it appears to the Court, but it is required by the language of the letter itself.

▊ By accepting such interpretation of the letter of April 8, the Court does not mean to imply that an institution under the jurisdiction of the State Board would necessarily be required in all cases to serve notice upon the student concerned and afford him an opportunity to be heard with respect to his actual conduct. There may be cases where the fact of conviction alone would necessarily import personal misconduct reflecting dishonor and discredit upon the institution, such as convictions for murder, rape, housebreaking and larceny, and numerous other examples which might be mentioned. But where the fact of conviction alone is not clearly indicative of personal misconduct in the sense used in the April 8 regulation, the Court is of the opinion that the due process clause of the Fourteenth Amendment, as construed by the Supreme Court, requires in the case of a state college or university notice to the student and an opportunity to be heard before the penalty of dismissal is inflicted. Otherwise, the school authorities are not in position to exercise their discretion and judgment in a fair and reasonable manner either from the standpoint of the school or of the student. This is most certainly true as to the technical violations which the Court has already mentioned, and the Court is convinced that it is true in the present case.

▊ In this connection, it is noteworthy that the discipline committee wrote the letter of June 1, 1961 suspending the plaintiffs from school on the basis of hearsay information which they had received that the plaintiffs had been convicted in Mississippi for breach of the peace. Presumably the committee also knew that the plaintiffs had traveled to Mississippi by interstate bus in connection with the freedom rides, but when the severe penalty of suspension was imposed upon the plaintiffs, the committee did not know and had no way of knowing what the plaintiffs had actually done and what their conduct actually was in bringing about their supposed convictions upon such a general and uncertain charge as a breach of the peace. The committee did not know and had no way of knowing whether the specific conduct of each plaintiff was of such character that it reflected dishonor or discredit upon Tennessee A & I State University as required by the regulation of April 8. In brief, the committee was not in possession of sufficient facts to enable it to exercise a fair or intelligent judgment. The necessity for a hearing in such a case is strongly emphasized by what actually occurred. As it turned out, the plaintiffs were not in fact convicted in Mississippi for a breach of the peace, as the committee had supposed, but were convicted under a Mississippi Statute, Section 2087.5 of the Mississippi Code of 1942, which defines the offense of "disorderly conduct" as follows:

"* * * Whoever with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby: (1) crowds or congregates with others in or upon * * [naming certain public places] and who fails or refuses to disperse and move on, or disperse or move on, when ordered so to do by any law enforcement officer of any municipality, or county, in which such act or acts are committed * * * *shall be guilty of disorderly conduct.*" (Emphasis added.)

Under the general terms of this statute the plaintiffs were convicted on a charge that "with intent to provoke a breach of the peace" they congregated with others in or around a bus terminal in Jackson, Mississippi, and failed or refused to disperse and move on when ordered to do

so by a law enforcement officer. The committee, in fact, did not even have before it the exact terms of this charge against the plaintiffs at the time they took disciplinary action. But even if the charge itself had been before the committee it would have conveyed very little information as to what the plaintiffs had actually done and at best would have left a serious doubt as to whether the plaintiffs had been guilty of such misconduct as would reflect dishonor or discredit upon the University. It is entirely conceivable under the vague and indefinite terms of the Mississippi Statute and the equally vague charge upon which the plaintiffs were convicted that they were guilty at most of a technical violation which the committee, if apprised of the true facts, could have decided did not call for the penalty of dismissal.

Defendants' argument that the discipline committee should not be required to go behind the convictions of a court of competent jurisdiction fails to meet the real issue. In investigating the facts attending the commission of the offense, the committee would not go behind the convictions for the purpose of determining whether they were valid or whether the students were guilty or not guilty of the offense charged, but for the purpose of determining whether the convictions, conceding their existence and validity, were for offenses actually involving the type of conduct which is aimed at by the regulation of April 8, 1960. The purpose of the investigation would be for the University to decide for itself whether there had been in fact a violation of its own disciplinary regulation.

The defendants' further insistence that the plaintiffs cannot complain because they did not request a hearing from the University is not tenable, for the evidence makes it plain that when they did finally obtain an interview with the President of the University they were emphatically advised that the action already taken was mandatory and that the plaintiffs had no recourse except to appeal to the courts. It is clear that a request by the students for a hearing on the part of the University would have been promptly denied and consequently would have been an idle ceremony. The alternative suggestion that the plaintiffs had a right to a hearing by making application to the Circuit or Chancery Court under the Tennessee Statute, T.C.A. Sec. 27–901 et seq., for statutory certiorari is fully answered by the Supreme Court of Tennessee in Stockton v. Morris & Pierce, 172 Tenn. 197, 212, 213, 110 S.W.2d 480. It was there held that the statute has no application where a state board or commission makes its determination without affording any hearing to the party affected.

The plaintiffs' additional theory that the regulation of April 8 was enforced against them as a punitive measure by reason of their participation in the freedom rides into the State of Mississippi, and that the action of the discipline committee was, therefore, violative of the plaintiffs' rights under the Fourteenth Amendment and under the Commerce Clause can be disposed of in a few words. The regulation on its face makes no mention of race or racial demonstrations or activities and appears to be a fair and reasonable rule having a uniform application to all institutions of higher learning of the State under the jurisdiction of the State Board. There is no evidence in the record from which the Court could conclude that application of the regulation to the plaintiffs was dictated by a desire to punish them or to intimidate them by reason of their activities in Mississippi. It will be recalled that the letter was written approximately one year before it was invoked against the plaintiffs. It is true that it was promulgated during the sit-in demonstrations in Nashville and that it was not invoked at that time against Tennessee A & I students who participated in the demonstrations. But this fact was explained by the President of the University upon the ground that the regulation at that time had just been adopted and that it was not deemed fair to the students to enforce it against them until there had been an op-

portunity to explain its meaning and purpose to the entire student body. After the sit-in demonstrations, the University held a series of student meetings, referred to as workshops, in which the April 8 regulation was fully discussed and its provisions made known to the student body. The members of the Committee and the President of the University who enforced and applied the regulation were presumably sympathetic to the general aims and purposes of such movements and activities as the sit-in demonstrations and the freedom rides, and they deny any intent or purpose to penalize or punish the plaintiffs for their participation therein. The plaintiffs' insistence in this connection has no evidentiary support and the Court is convinced that the State Board and its Chairman and the University acted in good faith both in adopting the regulation and in enforcing it against the plaintiffs.

■ In accordance with the views herein expressed, the Court is of the opinion that the plaintiffs are entitled to injunctive relief to enforce their rights to procedural due process with respect to any disciplinary action on the part of Tennessee A & I State University growing out of their Mississippi convictions and any alleged violations under the regulation of April 8, 1960. However, since some of the plaintiffs have been dropped from the University because of failure to meet academic standards, and because there are other practical problems concerning the type of notice and hearing to be provided, the timing thereof, and the question of reinstatement of the plaintiffs pending such notice and hearing, the parties through their attorneys should endeavor to agree upon the exact terms of the injunctive order. With respect to the type of notice and hearing to be provided, consideration should be given to the observations made by the Court of Appeals for the Fifth Circuit in the Dixon case. There are also some valuable observations on these questions in the opinion of the Supreme Court of Tennessee in State ex rel. Sherman v. Hyman, supra. If the parties are unable to agree upon the terms of the order, the Clerk will be notified accordingly and the parties will be advised of an early date for a hearing before the Court to determine and fix the terms of the injunction.

Nothing in this opinion should be construed or taken as indicating any view on the part of the Court upon the merits of any issues to be presented to the discipline committee of the University or any view as to whether the regulation of April 8, 1960, was or was not violated by the plaintiffs or any of them.