Robert W. KELLEY and Henry C. Maxwell, Jr., et al., Plaintiffs,

v.

METROPOLITAN COUNTY BOARD OF EDUCATION OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE et al., Defendants.

Civ. A. Nos. 2094, 2956.

United States District Court
M. D. Tennessee,
Nashville Division.

Nov. 22, 1968.

Avon N. Williams, Jr., and Z. Alexander Looby, Nashville, Tenn., Jack Greenberg, James M. Nabrit, III, and Franklin E. White, New York City, for plaintiffs.

Neill S. Brown and Robert Edwin Kendrick, Nashville, Tenn., for defendants.

Charles Hampton White, Nashville, Tenn., for Tennessee Secondary School Athletic Association.

## OPINION

WILLIAM E. MILLER, Chief Judge.

This is a motion for additional relief filed in these consolidated civil actions in which, by prior orders the counterparts of the defendant, Metropolitan County Board of Education of Nashville and Davidson County, Tennessee, (School Board), were required to adopt an acceptable plan for the desegregation of their local public schools. Plaintiffs in their motion for additional relief requested the addition as party plaintiffs of a number of students at Cameron High School together with their parents as next friends. This motion was allowed. By supplemental process the Tennessee Secondary School Athletic Association, (TSSAA), of which Cameron High School is a member, was added as a party defendant. The plaintiffs by their motion seek an injunctive order (1) enjoining the action of the School Board and the TSSAA suspending the interscholastic athletic program of Cameron High School for a period of one year, (2) directing the transfer of certain additional plaintiffs and other Negro students to white high schools outside the zone of their residence, and (3) requiring the School Board to file with the Court a plan for full desegregation of its school system, and forcing the TSSAA to integrate its practices and staff. A hearing was held at which evidence was introduced on the issues concerning athletic suspensions of Cameron High School and the transfer of students. The Court reserved the right to hear evidence and to rule at a later time on the issues involving further public school desegregation.

On September 23, 1955, the original action was filed herein against Nashville's City Board of Education. Later the Court approved a twelve year desegregation plan for the local school system which included a pupil transfer provision. Kelly v. Board of Education of City of Nashville, 159 F.Supp. 272 (M.D.Tenn.1958); Kelly v. Board of Education of City of Nashville, 8 R.R.L.R. 651. That judgment was affirmed by the Court of Appeals for the Sixth Circuit, Kelley v. Board of Education of City of Nashville, 270 F.2d 209 (1959), and certiorari was denied by the Supreme Court of the United States. Kelley v. Board of Education of City of Nashville, 361 U.S. 924, 80 S.Ct. 293, 4 L.Ed.2d 240 (1959).

A later case was filed September 9, 1960 seeking like relief against the Dav-

488

idson County Board of Education. A similar long range plan of desegregation was approved, but on appeal the Supreme Court rejected that part of the plan providing for automatic transfers between school zones. Goss v. Board of Education of Knoxville, Tennessee, et al., 373 U.S. 683, 83 S.Ct. 1405, 10 L. Ed.2d 632 (1963).

The present motion was precipitated by the suspension of Cameron High School, an all Negro school, from interscholastic athletic competition for one year from April 4, 1968. The temporary suspension was imposed separately by the School Board and by TSSAA following investigations by them of alleged charges that students and other supporters of Cameron High School had engaged in misconduct at the Region V Basketball Tournament in Nashville, Tennessee, on March 8, 1968.

Early in March, 1968, a number of boys' and girls' high school basketball teams from several Middle Tennessee cities and counties met in Nashville for post-season tournament competition. One of the more hotly contested games was between Cameron and Stratford High Schools. The game was won by Stratford resulting in the fans for both teams displaying strong emotions over the outcome. Apparently, for one reason or another, the Cameron team incurred many more fouls than its opponent and the Cameron students and fans were quite disturbed. There is evidence that at the end of the game various groups of spectators departed from tournament standards of conduct; that a group from the Stratford cheering section violated the tournament rules by rushing onto the playing floor to congratulate their team; and that on the other side of the floor, large numbers of Cameron fans attempted to exit improperly, creating further confusion and causing the next scheduled game to be delayed.

The tournament was directed by Jacky Ray Davis, a teacher and coach at Lipscomb High School. Prior to, and during the basketball game, Davis announced the procedure and conduct to be followed by all spectators. He provided approximately fourteen policemen to maintain order, but they were unable fully to contain the crowds after the game. There is substantial evidence that groups of young Negroes carrying Cameron colors congregated outside the stands and marched around the hallways and ramps chanting and striking others as they passed. There is also evidence that cheerleaders and fans from the Cameron student section struck and verbally abused the referees; that the spectators refused to return to their seats upon request and it was necessary temporarily to discontinue the following basketball game until order was restored; and that because of the numerous problems and injuries reported to them, the tournament director and the policeman in charge called police headquarters for assistance from on-duty policemen.

The disturbances at the tournament were discussed at the next regular meeting of the School Board, at which time a special committee was appointed to investigate various complaints of misconduct growing out of the tournament. The committee was composed of the School Board's regular Athletic Council and three others, one of whom was a School Board member and the other two citizens at large. The committee as constituted had a total membership of 16, 5 of whom were Negroes.

Notice was served on the principals of Stratford, North, and Cameron High Schools by telephone that the Board's Investigating Committee was to conduct a hearing with respect to the alleged disturbances and the use of tranquilizers and stimulants at the Regional Basketball Tournament. The hearing was in the nature of an investigatory proceeding and no charges were filed against any particular school or individual. Mr. Oscar R. Jackson, principal of Cameron, was requested to appear before the Committee at a specified time and place and to bring with him Cameron's assistant principal, athletic business manager,

basketball coach, assistant coaches, cheerleader sponsor, cheerleaders, teacher German Wilson, and any others having information bearing on the matter under investigation.

The Committee received testimony from school officials who had attended the Cameron-Stratford game, the Tournament directors, the Supervisor of the Middle Tennessee Basketball Officials Association, the Cameron-Stratford referees, Metropolitan police officers present at the tournament, and the requested representatives of the high schools involved. Although the Cameron School principal or his representative was present when witnesses produced by him were examined by the Committee members, he was not present when other witnesses were examined. Nor was he offered the opportunity to examine or cross-examine witnesses. Following the hearing a transcript of the testimony was prepared. Early in April, 1968, the Committee presented to the School Board findings of fact and recommendations which it had unanimously adopted. The Board approved the recommendations on April 4, 1968, without dissent, suspending Cameron from all interscholastic athletic competition for one year and establishing lesser penalties for two other schools. The Committee's findings as to Cameron were:

1. Certain unidentified Cameron Cheerleaders were actively involved in abusive conduct toward Cameron-Stratford game officials immediately following the game.

 \* \* \* \* \* \*

3. A large number of people including Cameron students, refused to leave the corridors and take auditorium seats as requested by the public address announcement made by the tournament director prior to the start of the following game.

4. The administrative staff of Cameron High failed to provide adequate supervision during and following the game.

 \* \* \* \* \* \*

6. There appeared to be inadequate preliminary orientation in preparing the student body for the game and its possible outcome in view of the intense rivalry between the two schools.

 \* \* \* \* \* \*

Subsequent to the School Board's action, A. F. Bridges, Executive Secretary of the TSSAA, advised Mr. Jackson by telephone that as a result of its own investigation the TSSAA concurred in the action taken by the School Board and proposed to suspend Cameron High School for a like period of one year pursuant to TSSAA regulations.[1] The principal was offered the benefit of a hearing but agreed with Mr. Bridges that in view of the suspension by the School Board such a hearing would be superfluous. TSSAA formally suspended Cameron from interscholastic athletic competition on June 17, 1968, effective April 4, 1968 for a period of one year.

No further action was taken until July 9, 1968, at which time a plea for a reconsideration was heard by the School Board. The hearing was granted at the request of Attorney Avon N. Williams, Jr., but was limited to a thirty minute argument by Mr. Williams and a brief statement by Mrs. M. M. Drake, Chairman of the South Nashville Citizens Committee. No witnesses were allowed. The Board deferred action until its next meeting to enable its members to re-read the transcript of the original Committee hearing. At the Board's July 23, 1968 meeting, Mr. Williams pleaded further for reconsideration but the Board refused to alter its previous action.

On September 1, 1968, the principal of Cameron, and the Director of Metropoli-

---

[1]. The responsibility of each member school is clearly defined in the TSSAA manual which states that "schools are responsible for the conduct of their own fans and students at every athletic contest regardless of where it might be held." Article IV, Section 5.

tan Schools, Mr. John H. Harris, jointly requested the TSSAA to make a further independent investigation of the suspension. Bridges responded to the request by stating that it was TSSAA's policy to refuse to reopen a case of this kind "unless new evidence can be submitted which will warrant further consideration of the case." He requested that Mr. Jackson submit such evidence if available and stated that it would be duly considered by TSSAA and a decision made on the request for a reopening. No attempt was ever made to present new evidence.

The present motion for further relief was filed on September 19, 1968.

### JURISDICTION

■ 42 U.S.C.A. § 1983 gives plaintiffs the right to bring this action for injunctive relief against defendants (School Board and TSSAA), who, plaintiffs claim, acting under color of state law, deprived them of federally protected rights in suspending plaintiffs' high school from interscholastic athletic competition. Such state action, plaintiffs maintain, violates their rights guaranteed by the Fourteenth Amendment to the Constitution of the United States. Jurisdiction to hear the action is conferred upon this Court by 28 U.S.C.A. § 1343(3). Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).[2]

■ Defendant School Board has questioned the propriety of this Court determining the issues raised in this case with respect to the suspension of Cameron High School on the ground that a remedy is available to plaintiffs under the state certiorari statutes. T.C.A. §§ 27–901 through 914. It is now a well-settled principle that the remedy provided by § 1983 is supplementary to any state remedy and "the latter need

not be first sought and refused before the federal one is invoked." Monroe v. Pape, supra at 183, 81 S.Ct. at 482.

### STANDING

■ Defendant TSSAA strongly contests the standing of plaintiff, Cameron students and parents of Cameron students, to litigate the constitutionality of the Cameron High School suspension.

TSSAA maintains that while an individual student who has been suspended might seek to challenge such action on the basis of a violation of his civil rights, no such right is afforded to students of a school whose entire interscholastic athletic program has been suspended.

On the question of standing, the United States Supreme Court in a recent decision said:

> The fundamental aspect of standing is that it focuses on the *party* seeking to get his complaint before a federal court and not on the *issues* he wishes to have adjudicated. The 'gist of the question of standing is whether the party seeking relief has alleged such a *personal stake* in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). (Emphasis added). Flast v. Cohen, 392 U.S. 83, 101, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968).

Unquestionably, it is the Cameron students comprising its athletic teams, and also its band members, its cheerleaders, and the majority of Cameron athletic supporters who are substantially affected by the suspension of Cameron High School from interscholastic athletic com-

---

2. 28 U.S.C.A. § 1343(3) provides: "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: * * *. (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom, or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

petition. It is the Cameron students, some of whom are the plaintiffs in this case, who have "a personal stake in the outcome of the controversy." Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The Court would be hard pressed to conceive of more appropriate parties to complain because of the suspension, or of persons more directly, adversely and personally affected.

The principal of Cameron, it is true, represents the school in an official capacity, but in view of the personal stake Cameron students, particularly those engaging in athletics, have in the outcome, the Court concludes that they have legal standing to assert and maintain claims presented by the present motion.

## STATE ACTION

■ The next issue for determination is whether the TSSAA, a corporation organized under the Tennessee General Welfare statutes, is subject to the constitutional limitations of the Fourteenth Amendment.

In its answer and in its argument to the Court, the TSSAA insisted that it was not a state instrumentality, and, therefore, that it was not subject to the due process requirements of the Fourteenth Amendment. It was pointed out that the TSSAA is a voluntary association.

Federal courts have held that the TSSAA's counterparts in Oklahoma and in Louisiana are subject to the limitations of the Fourteenth Amendment. Louisiana High School Athletic Association v. St. Augustine High School, 396 F.2d 224 (5th Cir. 1968); Oklahoma High School Athletic Association v. Bray, 321 F.2d 269 (10th Cir. 1963).

As in those cases, there is abundant evidence here to support the conclusion that the association is an instrumentality of the state for purposes of the Fourteenth Amendment.

The TSSAA was organized for the primary purpose of performing a public function. Its stated objective is to "stimulate and regulate the athletic relations of the secondary schools of Tennessee." The vast majority of the schools belonging to the association are public schools constituting a part of the State's secondary school system.

The Association's Board of Control and Legislative Council must be composed of school principals or superintendents. While the Executive Secretary of the association is not an employee of the State Board of Education, his salary and the other expenses of the association are paid from revenues primarily derived from games between member schools. Many of the games are played in state-owned buildings or on state-owned properties, and by the use of state-owned facilities.

In the Court's view the functions of the TSSAA are so closely identified with state activities that the association is subject to the constitutional limitations placed upon state action by the Fourteenth Amendment. See Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966).

## DUE PROCESS
## THE SCHOOL BOARD SUSPENSION

■ Whenever a governmental body acts to injure an individual, the Constitution requires that the act be consonant with due process of law. Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir. 1961); Knight v. State Board of Education, 200 F.Supp. 174 (M.D. Tenn. 1961).

Clearly the action of the School Board in suspending Cameron High School from all athletic competition for the period of one year personally affected the students of Cameron High School in an adverse manner.

Defendants argue that the interests student plaintiffs have in engaging in athletics is a mere privilege and not a constitutional right.

This argument was answered by the United States Supreme Court in Cafeteria & Restaurant Workers Union, Local 473, AFL-CIO v. McElroy, 367 U.S. 886,

81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), when it said that the question of whether "* * * summarily denying Rachel Brawner access to the site of her former employment violated the requirements of the Due Process Clause of the Fifth Amendment * * * cannot be answered by easy assertion that, because she had no constitutional right to be there in the first place, she was not deprived of liberty or property by the Superintendent's action. 'One may not have a constitutional right to go to Bagdad, but the Government may not prohibit one from going there unless by means consonant with due process of law.' "

As this Court said in the *Knight* case, "Private interests are to be evaluated under the due process clause of the Fourteenth Amendment, not in terms of labels or fictions, but in terms of their true significance and worth." 200 F. Supp. at 178.

It is undeniable that as stated in the defendant TSSAA's Handbook, "[I]nterscholastic athletics are an integral part of the total educational process."

■ It is sufficient for purposes of this case to conclude that the right or interest that the Cameron students were deprived of by virtue of the one year suspension, i. e., the right to engage in secondary school athletics, is of such significance and worth as to require that the proceedings which resulted in the one year suspension conform to the standards of due process.

The minimum procedural requirements necessary to satisfy due process of law depend upon the circumstances and interests involved in the particular case. *Dixon,* supra, 294 F.2d at 155.

No case has been cited to the Court dealing with circumstances and interests identical to those in the case at hand, nor has the Court's independent research revealed such a case. Since the question of what due process of law requires in a proceeding resulting in the disciplinary suspension of a public secondary school

from interscholastic athletic competition has apparently not been dealt with by the authorities, this Court, as it did in the *Knight* case, must apply to the facts of the instant case the criteria of due process of law articulated by Mr. Justice Frankfurter in his concurring opinion in Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 163, 71 S.Ct. 624, 644, 95 L.Ed. 817 (1951):

Whether the ex parte procedure to which the petitioners were subjected duly observed 'the rudiments of fair play', * * * cannot * * * be tested by mere generalities or sentiments abstractly appealing. The precise nature of the interest that has been adversely affected, the manner in which this was done, the reasons for doing it, the available alternatives to the procedure that was followed, the protection implicit in the office of the functionary whose conduct is challenged, the balance of hurt complained of and good accomplished—these are some of the considerations that must enter into the judicial judgment.

As stated in the later Supreme Court opinion in Cafeteria & Restaurant Workers Union v. McElroy, supra, "consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the governmental function involved as well as of the private interest that has been affected by governmental action." 367 U.S. at 895, 81 S.Ct. at 1748.

■ Having considered the facts of this case in the light of the principles set forth above, this Court is of the opinion that the rudiments of fair play which are the essence of due process of law required that Cameron High School, through its principal, be given notice of the charges against it, which if substantiated by the evidence, would have justified suspension of Cameron from interscholastic competition for one year, and an opportunity to defend against such charges before such drastic disciplinary action was taken by the School Board.

T.C.A. § 49–214 provides that "It shall be the duty of the county board of education * * * (2) To manage and control all county public schools established or that may be established." Pursuant to T.C.A. §§ 6–3702 and 6–3711, the Charter of the Metropolitan Government of Nashville and Davidson County, Tennessee [hereinafter Metro] provides that Metro shall be vested with all powers which cities are authorized or required to exercise, and which counties are authorized or required to exercise under the Constitution and general laws of the State. (Section 2.02). The Charter empowers Metro "To establish, maintain and regulate, free of sectarian influences, a system of free schools." (Section 2.01(4)). In addition, the Charter provides that "A system of public schools for [Metro] is hereby established, which shall be administered and controlled by the metropolitan county board of education * * *" (Section 9.01). Section 9.03 provides that "the board is authorized to do all things necessary or proper for the establishment, operation and maintenance of an efficient and accredited consolidated school system for the metropolitan government * * *"

 Under these broad grants of power, the School Board had the authority to establish and supervise athletic programs for the schools in its system. In the exercise of its discretion the Board undoubtedly could have discontinued interscholastic sports in the metropolitan school system altogether if for some reason it saw fit to do so. The School Board argues, however, that it is within its discretionary power to suspend an individual school from interscholastic athletic competition where there is a finding of misconduct supported by substantial evidence, despite the absence of a specific rule prohibiting such conduct, and without notice or a hearing.

 The Court cannot agree with this contention. Authorities recognize that the governmental power with respect to matters of student discipline in public schools is not unlimited. See Dixon, supra; Knight, supra; State ex rel. Sherman v. Hyman, 180 Tenn. 99, 171 S.W.2d 822 (1942). While the private interest involved in those cases is not the exact equivalent of the interest here, the difference is more superficial than real. We are confronted here with the denial of interscholastic athletic activities to an entire school in all sports for a period of one year, a penalty affecting the guilty and the innocent alike. This form of discipline has been correctly characterized in the record as group punishment. Although the right to pursue an academic education is not directly affected, the penalty infringes upon a facet of public school education which has come to be generally recognized as a fundamental ingredient of the educational process. It would appear obvious that before such a valuable interest is denied, the rudiments of fair play would dictate the right to notice and a hearing. As the Court of Appeals for the Fifth Circuit said in the Dixon case:

> There are no considerations of immediate danger to the public, or of peril to the national security, which should prevent the Board from exercising at least the fundamental principles of fairness * * *. 294 F.2d at 157.

 There are two separate considerations which lead this Court to believe that the School Board denied Cameron High School the protection of procedural due process. The first of these is the lack of pre-existing standards and regulations to structure any disciplinary action taken by the Board; and the second is the conspicuous absence of a formal charge, followed by a hearing, against any particular school or individual of misconduct.

The imposition of penalties in the absence of prescribed standards of conduct is contrary to our basic sense of justice. The requirement that the official personnel of a public school shall have responsibility for the conduct of fans and spectators at an athletic contest itself carries a heavy burden and can be justi-

fied only on the basis of practical necessity. The burden is compounded when the penalty may entail the denial of athletic benefits to an entire group regardless of individual blamelessness. If group responsibility of such magnitude is to be upheld, no great inconvenience or burden is imposed upon a state agency by requiring it to specify the standards and rules to guide the actions of its subordinates and to delineate forms of punishment for the violation of such rules. Without some guiding standards the possibilities of arbitrary action are increased and individual interests are likely to suffer.

■■■ The School Board argued that it did have a pre-existing standard of conduct in the "Policy and Interpretation Procedure for Secondary Schools" manual which was distributed to all public schools. The rule upon which the Board relies states that "TSSAA sponsored events will be under the jurisdiction of the 'TSSAA Rules and Regulations' ".

This contention is unsound for two reasons. In the first place, the "TSSAA Rules and Regulations" confers exclusive authority to suspend schools for rule infractions upon the agencies of that association; and the provision of the School Board manual just referred to would appear to do nothing more than to confirm the authority and jurisdiction of the association with respect to all TSSAA sponsored events without assuming any authority or jurisdiction on the part of the School Board. In the second place, the "TSSAA Rules and Regulations" are listed under the heading "Out of Town Games", and in any event would appear to have no application to the games involved here which were played in the City of Nashville.

■■■ Unlike a private school where the relations between a student and the school are a matter of contract, the relations between a School Board and the students at a public school are governed by the concept of fundamental fairness embodied in the due process requirement

for state action. The rule that due process of law requires notice and some opportunity for a hearing before a student at a state supported university or college may be expelled has now become well established. *Dixon*, supra; *Knight*, supra; Madera v. Board of Education of City of New York, 267 F.Supp. 356 (S. D.N.Y.1967). The obligations of procedural fairness cannot be greatly diminished where the continuation of an integral part of the educational process at the secondary level is at stake.

Upon a review of the record in this case, the Court can find no considerations which would justify the Board of Education's failure to afford Cameron High School at least the rudiments of an adversary hearing—notice of a specific charge of misconduct, and a hearing upon such charge, before imposing admittedly drastic group disciplinary punishment.

The interests involved here are those of students concerned about the continuation of their school's interscholastic athletic program. As already pointed out, it is universally recognized that a secondary school's athletic program is an integral part of the student's total educational experience. The suspension of a school's athletic program adversely affects practically all students in the suspended school to a greater or lesser degree. Most directly affected in this case are the Cameron athletes who are prohibited from engaging in all interscholastic sports competition. Evidence was presented to show that several Cameron athletes were being considered for collegiate athletic scholarships, and that their inability to perform in their senior year may deny them a college education which they could not otherwise afford. Less directly but yet significantly affected are the Cameron cheerleaders, members of the band, and athletic fans comprised mostly of members of the student body.

The disciplinary group suspension for misconduct must be particularly distressing and, indeed, frustrating to the

members of the Cameron basketball team in light of the Investigating Committee's finding that "the coaches and team members are commended for their conduct immediately following the game," and to participants in other sports, such as football, who had no connection with the events at the tournament in question.

 The Court does not hold that group punishment is a constitutionally forbidden form of punishment. What it does hold is that the severity and harshness inherent in this form of punishment are significant factors dictating a closer adherence to the procedural standards of due process than might otherwise be the case.

 Plaintiffs admit, as they must, that the defendant Board has a legitimate stake in maintaining public order at athletic events and engendering sportsmanlike attitudes and behavior on the part of the students enrolled in the various schools in its system.

However, plaintiffs strongly contend that the manner in which the Board suspended Cameron violated due process of law, in that Cameron was not notified of the charges against it, nor afforded an opportunity to defend against those charges.

The procedure in question which culminated in Cameron's suspension was as follows:

1. The Board of Education appointed a biracial committee to *investigate* Misconduct at the Region V tournament and the use of stimulants.

2. Cameron's principal was notified of the investigation and instructed to bring certain persons to the investigative hearing, along with anyone else whom he thought might be helpful.

3. At the close of the investigation, the Investigating Committee unanimously made findings and recommendations to the Board of Education.

4. The Board of Education unanimously adopted the findings and recommendations of the Committee, and, accordingly, suspended Cameron High School from inter-scholastic athletic competition for the period of one year beginning April 4, 1968.

Defendant School Board contends that if notice and a hearing are required, the procedures outlined above constituted the necessary notice and hearing. It further urges that sufficient notice was given in a telephone conversation between Mr. William K. Wright and Mr. Oscar Jackson, principal of Cameron, in which Wright, at the instruction of the Board, told Jackson that the Board's Investigating Committee was going to hold a hearing concerning misconduct at the Region V Tournament.

 While this was undoubtedly sufficient notice to inform Mr. Jackson that an investigation was to take place, in the Court's opinion, it was not adequate to inform him of any charges against Cameron, which if proven, could entail the school's suspension from participation in interscholastic athletics.

At best, Mr. Jackson was made aware of an investigation of possible misconduct on the part of his school. Clearly this was not a sufficiently specific charge to place the principal upon notice that disciplinary punishment would be imposed if the investigation should disclose evidence of misconduct.

At no time during the investigation was a specific charge of misconduct levelled against Cameron; nor was there an intimation that possible disciplinary action was contemplated as a result of the investigation. The principal could have assumed, and with reason, that he would be afforded the opportunity to present his defenses to any specific charges that might result from the investigation. As the Supreme Court has said:

[T]he right to be heard before being condemned to suffer grievous loss of

any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society. Joint Anti-Fascist Refugee Committee v. McGrath, supra, 341 U.S. at 168, 71 S.Ct. at 646, 95 L.Ed. 817.

Plaintiffs contend that due process of law was not accorded Cameron for the additional reason that school officials may not take group punitive action against students, thus depriving them of valuable individual educational benefits without first affording them individual notice and a hearing. In support of this proposition plaintiffs rely upon Woods v. Wright, 334 F.2d 369 (5th Cir. 1964).

In this assertion they are mistaken. The Court of Appeals for the Fifth Circuit in *Woods* did not rule on the question of whether due process of law required individual notice and hearing for each student. In remanding the case to the district court, the Court of Appeals noted that the due process issue was in the first instance for the trial court.

▬▬▬ This Court is of the opinion that under the circumstances of this case individual notice and a hearing for each student was not required by due process of law. In cases of possible group misconduct on the part of students due process is satisfied if the notice and opportunity to defend are afforded to a responsible person whose position requires him to represent and speak for the entire group. A school principal occupies such a position.

## THE TSSAA SUSPENSION

The by-laws of TSSAA provide that member schools, through their principals, shall be responsible for the conduct of the fans and students at every athletic contest; and that "all games shall be properly supervised and policed to insure sportsmanlike contests." Specific authority is conferred upon "the Executive Secretary and/or the Board of Control of the Association to suspend, fine, or otherwise penalize any member

school for the violation of any of the rules of the Association, or for other just cause." The Constitution of the association requires that any school charged with violating TSSAA regulations shall be notified of such charges by the Executive Secretary. If desired by the school involved, a hearing upon the charges must be afforded before suspension or other disciplinary action is taken. The hearing shall be conducted by the Executive Secretary in the presence of two or more members of the Board of Control representing the grand division of the state in which the school is located. Any decision rendered by the Executive Secretary may be appealed to the full Board of Control. General administrative authority of the TSSAA is vested in the Board of Control consisting of nine members, one member being chosen from each of the nine athletic districts into which the organization is divided. Members of the Board of Control are required to be school principals or superintendents. As structured by the Constitution and By-Laws of the association, its relationships are with member schools and their principals alone and not directly with individual students.

While the association's Constitution and By-Laws do not undertake to particularize the types of unsportsmanlike conduct which shall justify disciplinary action, when the nature and character of athletic contests are considered, the Court is not prepared to hold that the TSSAA regulations fail to meet due process standards because of vagueness or lack of specificity. Unsportsmanlike conduct would necessarily cover such a wide variety of conditions and circumstances that it would be unrealistic to require that all possible types of misconduct should be spelled out or defined with exactitude. An examination of the Constitution and By-Laws of the association discloses that the following requirements are prescribed:

1. All games are required to be properly supervised and policed to insure sportsmanlike contests.

2. The host school is made directly responsible for providing a sufficient number of policemen to insure orderly conduct on the part of all spectators.

3. Member schools are made directly responsible for the conduct of the fans and students at every athletic contest.

4. The principal of each school in all matters pertaining to the athletic relations of his school is directly responsible to the association.

5. The association, is given authority to suspend, fine, or otherwise penalize any member school for the violation of any of the rules of the association, or for other just cause.

Before disciplinary action is taken by the association, notice of the charges must be given to the school involved and a hearing must be accorded, if a hearing is desired.

 These provisions are fully sufficient to notify member schools, as well as their students and fans, that unsportsmanlike conduct or misbehavior at athletic contests or games may result in the entire school losing its athletic privileges. With such rules and regulations in effect, neither the school principal nor individual students or fans are in position to contend or claim that they were without notice of the severe consequences which could result from group misconduct at athletic games. The Court is satisfied that due process of law required nothing further in the context of this case insofar as pre-existing standards are concerned.

The contention of the plaintiffs that the TSSAA denied them a hearing and that no specific charge of misconduct was made is not supported by the record. It is shown that the TSSAA made an investigation of its own, including a review of the transcript of the hearing before the Investigating Committee appointed by the School Board. Following this investigation, the Executive Secretary notified the Cameron principal that the association proposed to take the same action as the School Board in suspending Cameron from interscholastic athletic activities for a period of one year. At the same time the principal was notified that he could have a hearing if one was desired. Both parties agreed, however, that a hearing would serve no useful purpose since the school was already under suspension by the School Board. It would thus appear that the Executive Secretary of the association did, in substance and in effect, serve notice upon the principal of Cameron not only of a charge of misconduct but of the specific disciplinary action which it proposed to take. Since it appeared to both parties that a hearing upon the charge would be of little meaning and apparently of no benefit to Cameron, the hearing did not materialize. Subsequently, the principal, acting under some apparent pressure from his own students and school supporters, requested the association to conduct a further investigation. The Executive Secretary in reply pointed out that it was the policy of the association not to reopen a case of this type in the absence of additional evidence. The principal was requested to submit any further evidence which he might have, but this was never done and the matter was allowed to drop until the present motion was filed in this case.

Under these facts, which appear in the record without substantial dispute, the Court cannot conclude that the association denied Cameron High School due process of law in failing to make a specific charge of misconduct, or in failing to accord a hearing. The one important fact which predominated in the thinking of both parties at the time the matter was being discussed was the suspension for one year which had already been imposed by the School Board and which was still in effect. Neither party could have been expected to anticipate that the School Board's suspension would later be invalidated by a court. They had reason

to believe that the suspension would remain in effect in accordance with its terms and that it would effectively bar Cameron High School's interscholastic athletic activities regardless of any action which might be taken to the contrary by the association. In this posture, it was only reasonable that the principal of Cameron should see fit to forego a hearing before the association, and that the Executive Secretary of the association should concur in the propriety of this conclusion.

■ Nevertheless, while the Court concludes that the TSSAA has not infringed upon the constitutional rights of Cameron High School, it is of the opinion that since the School Board's suspension has been nullified and hence the principal reason for foregoing an association hearing has now been removed, Cameron should not be held to the consequences of a waiver of the right of an association hearing in accordance with the Constitution, By-Laws and rules and regulations of the association. It is true that the association did offer to reconsider the case upon receiving new evidence from Cameron, but such a limited proffer would not fully comply with the kind of hearing which is required by due process of law and provided for by the association's own Constitution.

### ALLEGED RACIAL DISCRIMINATION

■ Plaintiffs have insisted throughout the trial of this case and also in their briefs that racial discrimination was a controlling factor in Cameron High School's suspension, both by the School Board and by TSSAA. The Court has carefully examined this contention and is wholly unable to find any support for it in the record. Indeed, the contrary conclusion is required by the evidence—that race played no part in the action taken either by the School Board or by the TSSAA.

### TRANSFER OF STUDENTS

The Court entertained evidence at the hearing relative to the right of certain Cameron and other students to transfer to Hillsboro High School. Admittedly, there were certain administrative procedures available to plaintiffs in this category to which they did not resort, and it is the contention of the School Board that the right of transfer should be denied for this reason. The students claiming the right of transfer insist that the school system of Metropolitan Nashville has not been desegregated in accordance with the requirements of law and that as long as racial discrimination prevails in the operation of the school system, Negro students cannot be required to exhaust administrative remedies before applying for and obtaining transfers to the schools of their choice. However, the Court is of the opinion that this question cannot be appropriately resolved until the Court has heard the entire evidence on the question of racial discrimination in the Metropolitan school system. For that reason, the ruling at this time on the question of student transfers will be reserved.

### THE FORM OF JUDGMENT

A form of judgment consistent with the rulings made in this opinion will be submitted to the Court within seven days from date. The judgment will set aside and enjoin the enforcement of the suspension of Cameron High School from interscholastic athletic activities imposed by the School Board. Pending a possible further hearing before the TSSAA, the suspension imposed by that association will remain in full force and effect. If desired by the principal of Cameron High School, he shall have the right to request the TSSAA to afford him a hearing on behalf of his school concerning the charges of misconduct growing out of the tournament of March 8, 1968. Such request shall be made in writing and shall be submitted to the association not later than December 6, 1968. The association, upon the making of such request, shall grant a hearing in accordance with the procedure prescribed in its Constitution, By-Laws and regulations, to begin not later than thir-

ty days from and after the date the request for a hearing is made. If the association should fail to grant such a hearing as herein provided, its athletic suspension of Cameron High School shall be automatically enjoined.

The parties, in drafting the form of judgment to be submitted to the Court, shall undertake to agree upon the procedural details for conducting the association hearing, including representation by counsel, the possibility of limiting the number of witnesses to be examined, the persons who may attend and be present at the hearing, the right of cross-examination of witnesses and other procedural aspects. If such details cannot be resolved by agreement, the points of difference shall be submitted to the Court for its resolution.

The association shall have the right in connection with such hearing to rely upon the transcript of the hearing before the Investigating Committee of the School Board as well as upon written statements in its possession taken from witnesses having knowledge of relevant facts. But in such event the evidence of this type should be identified for the benefit of the Cameron principal, and, if desired, he should be permitted to call any witness whose testimony is thus used for cross-examination at the hearing. It is suggested that the parties may see fit to stipulate the use of pertinent portions of the transcript of the evidence taken before this Court at its hearings on the suspension issue and thus abbreviate the hearing before the TSSAA.

No comment in this opinion relative to the alleged misconduct of Cameron students or fans on the occasion in question should be taken as in any way binding upon the Cameron High School or upon TSSAA or any of its agencies in conducting the hearing.

The judgment shall provide that the Court retains jurisdiction of the actions for the purpose of effectuating the Court's rulings and disposing of all reserved issues.