**BRENTWOOD ACADEMY**

v.

**TENNESSEE SECONDARY SCHOOLS ATHLETIC ASSOCIATION and Ronnie Carter, Executive Director and Individually.**

No. 3:97–1249.

United States District Court,
M.D. Tennessee,
Nashville Division.

July 29, 1998.

H. Lee Barfield, II, W. Scott Sims, James Franklin Blumstein, and Gerald Thomas Nebel, Nashville, TN, for Plaintiff.

Richard Lee Colbert, Charles Hampton White, Nashville, TN, for Defendants.

## *MEMORANDUM*

CAMPBELL, District Judge.

### I. *Introduction*

Pending before the Court are Plaintiff Brentwood Academy's Motion for Partial Summary Judgment and for Permanent Injunction (Docket No. 27) and Defendants' Motion for Summary Judgment (Docket No. 47). The Court heard oral argument on the pending Motions on July 16, 1998. For the reasons described herein, Brentwood Academy's Motion for Partial Summary Judgment and for Permanent Injunction (Docket No. 27) is GRANTED in part and DENIED in part, and Defendants' Motion for Summary Judgment (Docket No. 47) is GRANTED in part and DENIED in part.

Brentwood Academy sued the Tennessee Secondary Schools Athletic Association ("TSSAA") and its Executive Director, Ronnie Carter, alleging violation of Plaintiff's First Amendment rights of free speech (Count I); violation of Plaintiff's Fourteenth Amendment substantive and procedural due process rights (Counts II and III); violation of federal antitrust laws (Count IV); equitable estoppel (Count V); and unfair, unreasonable, arbitrary and oppressive action in violation of state law (Count VI). Plaintiff seeks a permanent injunction barring the TSSAA from enforcing its "Recruiting Rule," as written and as applied to Plaintiff; money damages; attorneys' fees and costs. All the

above claims, except the antitrust claims, are the subject of the pending motions.

## II. *Facts*

Plaintiff Brentwood Academy is a co-educational, independent, college-preparatory school located in Brentwood, Williamson County, Tennessee. Combined Stipulations (Docket No. 24), ¶ 3. Brentwood Academy is a member of Defendant TSSAA, and the school's interscholastic athletic teams regularly participate in athletic contests regulated by the TSSAA. *Id.,* ¶ 9.

Defendant TSSAA is a non-profit corporation organized and existing under the laws of the State of Tennessee, with its principal place of business in Hermitage, Davidson County, Tennessee. *Id.,* ¶ 10.

Defendant Ronnie Carter is the Executive Director of the TSSAA and, at all times relevant to this action, acted as an employee and agent of the TSSAA and within the scope of his authority as an employee and agent. *Id.,* ¶ 11.

The TSSAA is an association of public, independent and parochial secondary schools from across the state of Tennessee. It is composed of 290 public schools and 55 independent and parochial schools. Public high schools compose 84% of the voting membership of the TSSAA, and independent and parochial schools compose 16% of the voting membership of the TSSAA. *Id.,* ¶ 12.

The purpose of the TSSAA is "to stimulate and regulate the athletic relations of the secondary schools in Tennessee." TSSAA Constitution, Art. I, Section 2.

By electing to be a member of TSSAA, each member school agrees to abide by the Constitution and By-laws of TSSAA. Combined Stipulations, ¶ 44. The parties have stipulated the authenticity of the TSSAA Constitution and By-laws. *Id.,* ¶¶ 17, 18.

The rules and regulations of the TSSAA are enacted by its Legislative Council, a nine-member body composed of high school principals or assistant principals or qualified superintendents elected by popular vote in each of nine electoral districts. Combined Stipulations, ¶ 14. The administrative authority of the TSSAA is vested in a Board of Control, composed of nine members who are high school principals or superintendents, similarly elected by popular vote. TSSAA Constitution, Art. III.

All the voting members of the Legislative Council and the Board of Control in 1997 were public high school administrators. None of the voting members of the Legislative Council and the Board of Control in 1997 were principals of independent or parochial schools. Combined Stipulations, ¶ 15.

The main question presented in this case is whether the following Recruiting Rule of the TSSAA violates the First Amendment or the Fourteenth Amendment to the United States Constitution:

### Recruiting Rule

Section 21. The use of undue influence on a student (with or without an athletic record), his or her parents or guardians of a student by any person connected, or not connected, with the school to secure or to retain a student for athletic purposes shall be a violation of the recruiting rule.

### 1.

Q. How is undue influence interpreted in the recruiting rule?

A. A person or persons exceeding what is appropriate or normal and offering an incentive or inducement to a student with or without an athletic record.

### 2.

Q. What is the penalty for violation of the recruiting rule?

A. Violation of the recruiting rule shall cause the student to be ineligible at the school in violation, and a penalty shall be placed against the school.

### 3.

Q. Is it permissible for a coach to contact a student or his or her parents prior to his enrollment in the school?

A. No, a coach may not contact a student or his or her parents prior to his enrollment in the school. This shall apply to all students whether or not they have an athletic record.

4.

Q. What are some of the guides used in determining whether there has been undue influence used which would result in a violation of the recruiting rule?

A. Some examples are, but not limited to:

1. Providing of transportation or other inducement to any prospective student/athlete to take a qualifying examination at a school, meet with school officials, etc.

2. Discussion of financial aid based on need with any prospective student/athlete by any member of the coaching staff until the student has enrolled in school (attended 3 days of school). All financial aid questions should be referred to the principal or the person in charge of financial aid. If the person in charge of financial aid is a coach, prior approval must be granted by the Executive Director of TSSAA.

3. Any initial contact or prearranged contact by a member of the coaching staff or representative of the school and a prospective student/athlete enrolled in any member school except where there is a definite feeder pattern.

4. Any initial contact or prearranged contact by a member of the coaching staff or representative of the school and a prospective student/athlete in the seventh grade and above at any non-member school except where there is a definite feeder pattern involving the schools.

Public high schools may contact public feeder schools (elementary, middle school, junior high school) where there is a definite feeder pattern. Private or parochial schools may contact private schools (elementary, middle school, junior high school) where there is a definite feeder pattern.

Private or parochial schools may not contact students enrolled at the public schools. Public schools may not contact students enrolled at the private schools.

5. Any contact between a member of the coaching staff or representative of the school and prospective student/athletes prior to, during, or after contests at elementary schools, middle schools, and junior high schools except where there is a definite pattern.

6. A member school is prohibited from giving any item with school advertisement (shirts, pennants, caps, jackets, etc.).

7. Admitting students to athletic contests free of charge where there is an admission being charged at the contest except where there is a definite feeder pattern involved with the school.

5.

Q. What is allowed by member schools in contacting prospective students?

A. A representative of the school may meet with students at a school that is defined as a feeder school or meet with students who are zoned to attend that school the following year. This visit must be cleared by the principals of both schools.

Guidelines For Understanding The "Recruiting Rule" and Understanding "What Is Undue Influence"

1. The major theme of the "recruiting rule" is not "initial contact." The major theme is "exceeding what is normal and appropriate." Initial contact can be a violation, but is only one of many things that can exceed what is normal and appropriate.

2. One key is not treating "athletes" or "prospective athletes" any differently than students who are not athletes.

3. Students should be seen as students and not singled out based on their potential athletic ability.

4. Pre-arranged contact is seen in the same manner as initial contact.

5. Any student or family or individual that contacts a coach about attending a school where he or she coaches should be informed that they need to contact the principal, admissions department, or guidance department if they have an interest.

6. Any meeting with coaches regarding athletes or prospective athletes or their families should be at the request of the family to the individual(s) responsible for admissions and should take place at the school.

7. High school athletics is not the same as colleges recruiting high school athletes for college athletics. High school athletics exist for an entirely different reason. High school coaches should not view 12, 13, 14 year old students in the same manner as college coaches view high school seniors.

8. Administrators and coaches must realize that they have more responsibilities than the general public to understand the purpose of high school athletics, the principles behind the TSSAA rules, etc., and to maintain a level of understanding and purpose when dealing with the general public and students.

TSSAA By-laws, Art. II, Section 21. TSSAA's first version of the "recruiting rule" was adopted in 1935, and the rule in all its forms since 1935 has prohibited "the use of undue influence." *Combined Stipulations,* ¶ 54.

Since 1925, the State Board of Education has recognized the functions of TSSAA in providing standards, rules and regulations for interscholastic competition in the public schools in Tennessee. *See* Docket No. 52 (Affidavit of Jerome V. Sailors), p. 2. In 1972, by rule, the State Board of Education designated the TSSAA as "the organization to supervise and regulate the athletic activities in which the public junior and senior high schools of Tennessee participate on an interscholastic basis." Tenn. Bd. of Educ. Rule 0520–1–2–.26 (later moved to Rule 0520–1–2–.08).

In addition, in 1972, the State Board approved the current rules and regulations of the TSSAA and reserved the right to review the appropriateness of any future changes. *Id.* On several occasions between 1972 and 1992, the State Board reviewed and approved the TSSAA rules, including the Recruiting Rule at issue in this case. Docket No. 66 (Affidavit of Gary Nixon), attachment, pp. 24–25, 34, 38, 44, 52–53, 73–74, 76–78, 82, 88.

In 1995, the State Board of Education adopted an amendment to Rule 0520–1–2–.08, which deleted the former rule and replaced it with the following: "The State Board of Education recognizes the value of participation in interscholastic athletics and the role of the Tennessee Secondary School Athletic Associ-ation in coordinating interscholastic athletic competition. The State Board of Education authorizes the public schools of the state to voluntarily maintain membership in the Tennessee Secondary School Athletic Association." Tenn. Bd. of Educ. Rule 0520–1–2–.08 and Docket No. 66, attachment, p. 183.

In 1997, certain public high school coaches made allegations of recruiting violations by Brentwood Academy, and those allegations were subsequently communicated to the TSSAA. *Combined Stipulations,* ¶¶ 35–37. Based on the allegations, the TSSAA, through Defendant Carter, began an investigation. *Id.,* ¶ 38. TSSAA made various claims, but only three allegations ultimately resulted in violations and penalties.

One claim involved the Brentwood Academy football coach, Carlton Flatt, allegedly providing free game tickets to a coach at a public middle school. The allegation was that Kevin Armstrong, a teacher and coach at Neely's Bend Middle School, used the free tickets for himself and two middle-school student-athletes, allegedly in violation of the Recruiting Rule. Complaint (Docket No. 1), Exs. A, D and G.

Another claim involved a Brentwood Academy basketball coach, John Patton, allegedly conducting impermissible off-season basketball practice with certain Brentwood Academy students in violation of the Off–Season Practice Rule. *Id.*

A third claim involved letters and telephone calls from the Brentwood Academy football coach, Carlton Flatt, to students from other schools who had contractually agreed to attend Brentwood Academy, to invite them to spring football practice at Brentwood Academy, allegedly in violation of the Recruiting Rule. *Id.*

In the spring of 1997, the father of an incoming ninth-grade student, who had already been accepted for admission to Brentwood Academy and had committed to attend in the fall, requested permission for his son to participate in Brentwood Academy's spring football practice. Affidavit of Carlton Flatt (Docket No. 30), ¶ 17; and Defendants' Local Rule Response ("Local Rule Response") (Docket No. 46), ¶ 77.

Brentwood Academy contends that in order to avoid an incorrect public perception and to avoid singling anyone out for special attention, the school sent a form letter (the "Spring Practice Letter") to all new incoming male students in grades nine and above, informing them of the dates for spring practice and inviting them to participate if interested. Flatt Affidavit, ¶ 19; and Local Rule Response, ¶ 80.

It is not a violation of the Recruiting Rule for incoming students to participate in school activities at Brentwood Academy, including spring football practice, prior to the time that they actually begin school at Brentwood Academy. *See* Docket No. 31, Ex. 0 (Carter Deposition), p. 39; and Local Rule Response, ¶ 75. The alleged violation of the Recruiting Rule is the invitation to attend football practice, not the football practice itself.

The Spring Practice Letter was mailed on or about April 23, 1997, to all new incoming male students who had signed contracts to attend Brentwood Academy. Docket No. 31, Ex. Q (Brasher Deposition), p. 63; Local Rule Response, ¶ 81.

The full text of the Spring Practice Letter reads as follows:

> Having officially enrolled at Brentwood Academy, the TSSAA allows you to participate in spring football practice. If you are not currently involved in a sport at your school, we would like to invite you to practice with your new team. Equipment will be given out April 30th at 3:30 downstairs in the locker room.
>
> *Spring practice will begin May 1, 1997 and conclude on May 14, 1997.* Practice begins at 3:30 and will be finished by 4:45. Due to the inconvenience to your parents, please do not feel that you must attend every practice. However, I do feel that getting involved as soon as possible would definitely be to your advantage.
>
> In the near future, you will receive a letter outlining our summer workout program. If you have any questions, please call me at school 373–0611 × 119, or at home 373–0475. We are certainly glad that you decided to become an *Eagle*.

> Your Coach,
> /s/ Carlton Flatt

Docket No. 31, Ex. J; and Local Rule Response, ¶ 82.

Prior to receiving the Spring Practice Letter, each of the students and their parents had already made initial contact with Brentwood Academy to express interest in attending, applied for admission, visited the campus, taken the admissions test, been accepted by Brentwood Academy, and entered into a contract to attend the school. Flatt Affidavit, ¶ 20; and Local Rule Response, ¶ 83.

After receiving the Spring Practice Letter, a parent telephoned Coach Flatt to ask whether it was important for his son to attend spring practice at Brentwood Academy if it conflicted with an activity in which the student was involved at his middle school. Flatt Affidavit, ¶ 22; and Local Rule Response ¶ 85.

Although the Letter indicated that spring practice was optional, Coach Flatt believed, in light of that telephone call, that all of the students who received the Letters should again be contacted and informed that they should not participate in spring practice if it conflicted with activities at their respective middle schools. Flatt Affidavit, ¶ 23; and Local Rule Response, ¶ 86.

Coach Flatt chose to telephone the students because there was not enough time before the start of spring practice to send another letter. Flatt Affidavit, ¶ 24; and Local Rule Response, ¶ 87.

On July 29, 1997, Brentwood Academy was notified by letter from Defendant Carter that the TSSAA had found Brentwood Academy guilty of six violations of TSSAA Rules. Complaint (Docket No. 1), Ex. A. Specifically, as it relates to the issues before this Court, the TSSAA found that Brentwood Academy violated the Recruiting Rule through the provision of free game tickets and the football Spring Practice Letter and telephone calls; and violated the Off–Season Practice Rule through the basketball practices mentioned above. *Id.*

As punishment for these violations, TSSAA imposed the following penalties: (1) Brentwood Academy would not be permitted any

off-season practice in football or basketball for two years; (2) Brentwood Academy was placed on probation for two years and fined $3,000; (3) no Brentwood Academy athletic team would be permitted to enter the tournament series for 1997–98, and the football and boys' basketball teams would not be permitted to enter the playoffs and tournament series for 1998–99; and (4) the middle-school students who were given free game tickets were declared ineligible to participate in athletics at Brentwood Academy at any level. *Id.*

Brentwood Academy appealed this imposition of sanctions in compliance with a two-step appellate procedure set forth in Article VI of the TSSAA Constitution. Complaint, ¶ 82; Answer, ¶ 82. The first appeal was held on August 13, 1997, before Defendant Carter and an advisory committee comprised of three members of the TSSAA Board of Control. *Id.;* Local Rule Response, ¶ 92.

Defendant Carter was solely responsible for deciding the appeal. Complaint, ¶ 83; Answer, ¶ 83; and Local Rule Response, ¶ 93. Although Defendant Carter was free to consult with the three board members who were present, he was not bound by their advice. Complaint, ¶ 83; Answer, ¶ 83; and Local Rule Response, ¶ 94.

As a result of this procedure, TSSAA changed the penalties as follows: (1) one of the four middle-school students was deemed eligible to participate in Brentwood Academy. sports at all levels; the three others were deemed eligible to participate at the junior varsity level only; (2) Brentwood Academy was placed on probation for four years, and the football and boys' basketball teams were denied the privilege of participating in the playoffs and tournament series for the 1997–98 and 1998–99 school years and forbidden from sharing in the tournament revenues or expense allotments for the 1999–2000 school year; (3) all other Brentwood Academy sports teams were allowed to participate in tournament series games, but they could not share in the tournament revenues or receive any expense allotments from the state tour-

nament series; (4) Brentwood Academy was not permitted any off-season practice in football and basketball for two years; and (5) administrative personnel of Brentwood Academy were required to meet with Defendant Carter to review all policies and procedures in regard to the athletic program. August 14, 1997 letter from Defendant Carter to Bill Brown, Headmaster, Complaint (Docket No. 1), Ex. D.

Under TSSAA procedures, Brentwood Academy next appealed to the full Board of Control at a hearing held on August 23, 1997. Combined Stipulations, ¶ 42; Local Rule Response, ¶ 97. All of the voting board members who participated in the Brentwood Academy hearings are principals of public high schools; none are principals at independent or parochial schools. Combined Stipulations, ¶ 15; Local Rule Response, ¶ 99.

Defendant Carter was present during the Board of Control's deliberation process. Docket No. 31, Ex. O, p. 15; and Local Rule Response, ¶ 101. Defendant Carter answered questions from members of the Board of Control during the deliberation process. Docket No. 31, Ex. O, pp. 15–16; and Local Rule Response, ¶ 102.

The Board of Control found three violations of TSSAA rules: (1) student-athletes being admitted free of charge to athletic contests; (2) contact with student-athletes, initiated by Brentwood Academy, while those students were enrolled at other schools;[1] and (3) Brentwood Academy coaches conducting impermissible off-season practice with Brentwood Academy student-athletes. Letter of August 23, 1997, from Mike Reed to Bill Brown, Headmaster, Complaint (Docket No. 1), Ex. G.

The Board of Control ultimately imposed the following penalties on Brentwood Academy:

1. The entire athletic program of Brentwood Academy was put on probation for four years.

2. Brentwood Academy's football and boy's basketball programs were sus-

---

1. TSSAA has stated that Coach Flatt had no intention of violating the Recruiting Rule by mailing the Spring Practice Letters and making the telephone calls. Combined Stipulations, ¶ 40.

pended from the TSSAA playoff series for the 1997–98 and 1998–99 school years.

3. Brentwood Academy was fined $3,000.

4. Brentwood Academy's football and boys' basketball programs were not permitted to engage in off-season practice in the 1997–98 and 1998–99 school years.

5. Appropriate administrative officials of Brentwood Academy were to meet with the TSSAA Executive Director to develop an administrative control plan to help guard against future problems.

Complaint, ¶ 89; Answer, ¶ 89; and Local Rule Response, ¶ 103. These penalties were not itemized by type of violation in the final decision of the TSSAA against Brentwood Academy. *Id.*

Brentwood Academy filed this action on December 12, 1997. On June 1, 1998, Brentwood Academy moved for partial summary judgment and for a permanent injunction, contending that the Recruiting Rule violates Plaintiff's First Amendment free speech rights and Plaintiff's Fourteenth Amendment substantive due process rights and that Article VI of the TSSAA Constitution, as applied in the disciplinary proceeding herein, violates Plaintiff's Fourteenth Amendment procedural due process rights. *See* Docket No. 27. On June 30, 1998, Defendants moved for summary judgment, contending that they are entitled to judgment as a matter of law on Plaintiff's constitutional and state law claims. *See* Docket No. 47. The antitrust claim (Count IV) is not the subject of these dispositive motions.

Additional facts are discussed below as necessary.

### III. *Summary Judgment*

As provided in Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–

10, 91 L.Ed.2d 202, 211 (1986). Of course, the court is to construe the evidence and all inferences to be drawn from it in the light most favorable to the nonmoving party. *Id.* at 255, 106 S.Ct. at 2513–14, 91 L.Ed.2d at 216.

The party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989).

The Supreme Court concluded in *Anderson* that a dispute about a material fact is "genuine" within the meaning of Rule 56 only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2510, 91 L.Ed.2d at 211–12. Since the preponderance of the evidence standard is used in this determination, more than a mere scintilla of evidence in support of the non-moving party's position is required. *Id.* at 252, 106 S.Ct. at 2512, 91 L.Ed.2d at 214.

Once a motion for summary judgment has been made, "the non-moving party bears the responsibility to demonstrate that summary judgment is inappropriate under Rule 56(e)." *Davidson & Jones Dev. Co. v. Elmore Dev. Co.,* 921 F.2d 1343, 1349 (6th Cir.1991). The non-moving party may not merely rest on conclusory allegations contained in the complaint, but must respond with affirmative evidence supporting its claims and establishing the existence of a genuine issue of material fact. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553, 91 L.Ed.2d at 274; *Cloverdale Equip., Co. v. Simon Aerials, Inc.,* 869 F.2d 934, 937 (6th Cir.1989). While the disputed issue does not have to be resolved conclusively in favor of the non-moving party to defeat summary judgment, "sufficient evidence supporting the claimed factual dispute" must be shown, thereby requiring resolution of the parties' differing versions of the truth by a jury or judge. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510, 91 L.Ed.2d at 212; *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569, 592 (1968).

## IV. *State Action*

Plaintiff brings this action pursuant to 42 U.S.C. § 1983 ("Section 1983") for alleged violation of Plaintiff's constitutional rights. Under Section 1983, a plaintiff must allege that he was deprived of a right secured by the U.S. Constitution or laws by a person acting under color of state law. 42 U.S.C. § 1983. Section 1983 erects no shield against merely private conduct, however discriminatory or wrongful. *Mineo v. Transp. Mgmt. of Tenn., Inc.,* 694 F.Supp. 417, 423 (M.D.Tenn.1988).

Thus, the initial question for the Court is whether the Defendants TSSAA and Carter are "state actors" subject to constitutional limitations under Section 1983. The Court finds that the TSSAA and Carter act under color of state law.[2]

The district courts in Tennessee have consistently held that the TSSAA acts under color of state law. In *Kelley v. Metropolitan County Bd. of Educ. of Nashville and Davidson County,* 293 F.Supp. 485, 491 (M.D.Tenn. 1968), this Court held that TSSAA was subject to the constitutional limitations placed upon state action. Citing comparable cases in Louisiana and Oklahoma, Judge Miller noted:

> The TSSAA was organized for the primary purpose of performing a public function. Its stated objective is to "stimulate and regulate the athletic relations of the secondary schools of Tennessee." The vast majority of the schools belonging to the association are public schools constituting a part of the State's secondary school system.
>
> The Association's Board of Control and Legislative Council must be composed of school principals or superintendents. While the Executive Secretary of the association is not an employee of the State Board of Education, his salary and the other expenses of the association are paid from revenues primarily derived from games between member schools. Many of the games are played in state-owned buildings or on state-owned properties, and by the use of state-owned facilities.

*Id.* The factors cited in *Kelley* are also present in this case.

In another decision of this Court, *Crocker v. Tennessee Secondary School Athletic Ass'n,* 735 F.Supp. 753 (M.D.Tenn.1990), *aff'd,* 908 F.2d 972 and 973 (Table) (6th Cir. 1990), Judge Nixon held that the TSSAA was a state actor for two reasons: (1) the State delegated to TSSAA its authority to regulate the eligibility of the public high school student to participate in interscholastic athletics and recognized TSSAA as the only organization to supervise and regulate athletic activities in which the public junior and senior high schools of Tennessee participate on an interscholastic basis; and (2) the composition of TSSAA's membership and leadership demonstrates that it is a state actor. *Id.,* p. 759. The delegation of authority referenced in *Crocker* was evidenced by a rule of the Tennessee State Board of Education. *Crocker,* 735 F.Supp. at 759 (citing Tennessee Board of Education, Rules, Regulation and Minimum Standards, 0520–1–2–.26(1)).

In *Graham v. Tennessee Secondary School Athletic Ass'n,* 1995 WL 115890 (E.D.Tenn. 1995), *appeal dismissed* (mootness), 107 F.3d 870 (Table), 1997 WL 76958 (6th Cir.1997), Judge Edgar found that the TSSAA was a "state actor" for purposes of Section 1983, under the "state compulsion test," set forth by the U.S. Supreme Court in *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). That test requires that the State must exercise some coercive power or provide such "significant encouragement," either overt or covert, that the choice of the private actor is deemed to be that of the state as a matter of law. *Id.,* 457 U.S. at 1004, 102 S.Ct. at 2786.

Judge Edgar found that the TSSAA met this test for two reasons. First, noting that the State had delegated its authority to regulate eligibility of high school students to participate in interscholastic athletics to

---

2. The parties have stipulated that Defendant Carter is the Executive Director of TSSAA and, at all times relevant to this action, acted as an employee and agent of TSSAA and within the scope of his authority as an employee and agent. Combined Stipulations (Docket No. 24), ¶ 11.

TSSAA,[3] the court held that the rules and regulations promulgated by TSSAA and their enforcement by TSSAA are "fairly attributable" to the State of Tennessee. *Graham,* p. *5. Second, the court found that the composition of TSSAA's membership demonstrates that it is acting under color of state law: "TSSAA includes among its membership every public high school in Tennessee. The Legislative Council and the Board of Control of TSSAA are composed of the principals of public schools. Thus, state employees, the public school principals, have some direct control over the development and implementation of TSSAA rules and regulations." *Id.,* p. * 5. The court also noted that even though TSSAA argued it did not receive any revenues directly from the State, it actually received the majority of its revenues from membership fees paid by public schools and from gate receipts at certain games between member schools, many of which are held in state-owned facilities. *Id.,* p. *6. These same factors are present in this case.

Defendants argue that *Graham* and *Crocker* do not apply because the State no longer "delegates" its authority to the TSSAA. Citing an amendment to the State Board of Education rule relied upon in those cases, Defendants argue that the State now merely authorizes the public schools to voluntarily maintain membership in the TSSAA. *See* Tennessee Board of Education, Rule 0520–1–2–.08.

A review of the history of the relationship between TSSAA and the State is informative. Since 1925, the State Board of Education has recognized the functions of the TSSAA in providing standards, rules and regulations for interscholastic competition in the public schools in Tennessee. Affidavit of Jerome V. Sailors (Docket No. 52), p. 2. In 1972, the State Board of Education, by rule, designated the TSSAA as "the organization to supervise and regulate the athletic activities in which the public junior and senior high schools of Tennessee participate on an interscholastic basis." Tenn. Bd. of Educ. Rule 0520–1–2–.26 (later moved to Rule 0520–1–2–.08). The authority granted expressly was to remain in effect until revoked. *Id.*[4] The TSSAA claims that authority was revoked in April of 1995, when the State Board of Education changed its rule. Even if that interpretation is true, however, for at least twenty-four years, the State expressly designated authority to TSSAA to regulate interscholastic athletics in the public schools.

Despite Defendants' bold statements to the contrary, clearly the State Board of Education has reviewed and approved rules and regulations of the TSSAA since at least 1972. The rule promulgated by the Board in 1972 stated: "The State Board of Education approves the current rules and regulations as stated in the Official Handbook of the Tennessee Secondary School Athletic Association and reserves the right to review the appropriateness of any future changes." Tenn. Bd. of Educ. Rule 0520–1–2–.26 (later moved to Rule 0520–1–2–.08). Based upon Defendant Carter's "history" of the Recruiting Rule at issue in this case [*see* Docket No. 51 (Affidavit of Ronnie Carter)], it is apparent that the Recruiting Rule was included in the rules and regulations approved by the State Board.

In 1984, the TSSAA briefed the State Board of Education on TSSAA goals, purposes and procedures. *See* Docket No. 66 (Affidavit of Gary Nixon), attachment, p. 10. Subsequent minutes of the State Board of Education meeting of May 27, 1988, state:

> In 1984 the Board delegated to TSSAA the authority to promulgate rules relative to secondary school athletic events. That action called for a periodic review and approval of the operational authority delegated to TSSAA. The staff of the State Board of Education conducted the review and recommended that the TSSAA rules be approved and the TSSAA be designated to continue as the agency to govern secondary athletics for the Board.

*Id.,* pp. 24–25.

On the agenda for the May 26, 1989 meeting of the State Board was the "annual re-

---

**3.** The court relied upon the same State Board of Education Rule cited in *Crocker.*

**4.** The State Board also determined that the Chairman of the State Board of Education "shall designate" a person or persons to serve in an ex-officio capacity on the TSSAA Board of Control and Legislative Council. Docket No. 52, p. 2.

view and report on Tennessee Secondary Schools Athletic Association Rules." *Id.*, pp. 28, 30 and 34. On May 31, 1991, the Board approved the rules and regulations of the TSSAA, including the Recruiting Rule. *Id.*, pp. 38, 52–53. A memo from then-Executive Director Brent Poulton to Board members concerning that May 31, 1991 meeting states: "In effect, this amounts to reaffirmation of the Board's decision to delegate responsibility for management of secondary school athletics to TSSAA." *Id.*, p. 44.

The State Board of Education again approved the rules and regulations of the TSSAA, as late as its March 27, 1992 meeting, where the TSSAA appeared through its Associate Executive Director, Bob Baldridge, provided a report to the Board, and reviewed the current status of the TSSAA rules and regulations. *Id.*, p. 88. Upon motion, the TSSAA rules were adopted and approved by the State Board of Education unanimously. *Id.*, pp. 73–74, 76–78, 82, and 88. Again, the State approval included the Recruiting Rule.

In his memorandum to Board members concerning this March 27, 1992 meeting, then-Executive Director Poulton stated: "This is somewhat ceremonial, though important as a means of reminding the world that *the TSSAA works as an agent on behalf of the State Board of Education.*" *Id.*, p. 82 (emphasis added).[5]

In his memorandum to State Board members regarding their May 21, 1993 meeting, then-Executive Director Poulton stated: "Competitive athletics is a big part of the high school experience. The Tennessee Secondary Schools Athletic Association (TSSAA) manages these activities as sanctioned by the State Board of Education. This annual report keeps members informed of issues and changes in TSSAA policies." *Id.*, p. 117.

It is disingenuous, at best, for Defendants to repeatedly state in their briefs, based upon testimony of Defendant Carter, TSSAA Executive Director, and Mr. Sailors, State Board of Education Executive Director, that the State has never reviewed or approved TSSAA rules. Such an assertion is utterly false, as demonstrated by the minutes of the State Board of Education.

In 1995, apparently in response to *Crocker* and *Graham*, the State Board of Education proposed and adopted an amendment to Rule 0520–1–2–.08 by deleting the existing rule and replacing it with the following: "The State Board of Education recognizes the value of participation in interscholastic athletics and the role of the Tennessee Secondary School Athletic Association in coordinating interscholastic athletic competition. The State Board of Education authorizes the public schools of the state to voluntarily maintain membership in the Tennessee Secondary School Athletic Association." *See* Affidavit of Gary Nixon (Docket No. 66), attachment, pp. 134–37, 145, 148, 151–54, 162, 171, 173–74, 182–83.

Although the language of the rule was changed to no longer "designate" TSSAA as the official organization for supervision and regulation of secondary school athletics, it clearly singles out the TSSAA by name to serve this function. More importantly, the conduct of the parties has not materially changed. As indicated below, the connections between TSSAA and the State are still pervasive and entwined. Nothing about the function of TSSAA has changed. Nothing about the realities of control over secondary school athletics has materially changed.

In short, the rule amendment had no material effect upon whether TSSAA is a "state actor" for purposes of Section 1983. The State of Tennessee, through custom and practice, then explicitly, and then through custom and practice again, has recognized TSSAA as the official body for the regulation and control of interscholastic athletics. A mere change in the words of the regulation, apparently to avoid a litigation claim of state action, did not change the actual conduct of the State and did not change the actual conduct of the TSSAA, which constitutes state action. To hold otherwise would raise form over substance.

The decisions in both *Crocker* and *Graham* rely upon other factors besides the "delega-

---

5. The Court strongly disagrees that the vote of a state entity acknowledging that another body is its "agent" is "ceremonial." In any event, it is state action.

tion" argument.[6] In both decisions, the courts noted the composition of TSSAA's membership and leadership as a basis for state action. *See Crocker,* 735 F.Supp. at 759; *Graham,* 1995 WL 115890 at ** 5–6. Nothing about the composition and leadership of TSSAA has changed since *Crocker* and *Graham.*

It is undisputed that the overwhelming majority (84%) of the members of TSSAA are public schools. Combined Stipulations (Docket No. 24), ¶12. Members of TSSAA must be schools accredited by the State Board of Education. TSSAA Bylaws, Art. 1, Section 1.

TSSAA is governed by a Board of Control and a Legislative Council, elected by the members. TSSAA Constitution, Arts. III and IV. In 1997, all members of the Board of Control and the Legislative Council were principals of public schools. Combined Stipulations, ¶15. Thus, the membership of the TSSAA is primarily public schools and the governance of the TSSAA is exclusively by public officials. In addition, the TSSAA admits it is the only organization providing these benefits to the public secondary schools in Tennessee.[7]

The Sixth Circuit Court of Appeals addressed the issue of state action in interscholastic athletics in *Yellow Springs Exempted Village School Dist. Bd. of Educ. v. Ohio High School Athletic Ass'n,* 647 F.2d 651 (6th Cir.1981), where it found that "[t]he OH-SAA's character as a semi-official in its activities and its symbiotic relationship with the state lead to the conclusion that the trial judge correctly found state action." *Id.,* p. 653. The court cited many examples of the "symbiotic relationship" between the OHSAA and the state, including the OHSAA's organization of competitions, setting of schedules, arrangement of places to play tournament games, prescription of uniform rules of play, and power to sanction schools which violate those rules. *Id.* In addition, the court noted that to be a member of OHSAA, a school must be accredited by the State Board of Education and that membership in OHSAA

is a virtual necessity, since the State Board does not provide any interscholastic athletic programs. *Id.* The same indications of a symbiotic relationship exist in this case.

After *Yellow Springs,* in *Graham v. National Collegiate Athletic Ass'n,* 804 F.2d 953 (6th Cir.1986), the Sixth Circuit held that the National Collegiate Athletic Association ("NCAA") was not a state actor. Specifically, the court held that the NCAA conduct was not traditionally and exclusively the state's prerogative and that the state did not cause, control or direct the NCAA's action. *Id.,* p. 958. The Court finds significant the fact that *Graham* involved the NCAA, a national athletic association, and not a state association.

The Supreme Court, in holding that a *national* athletic association (the NCAA) was not a "state actor," specifically noted: "The situation would, of course, be different if the membership consisted entirely of institutions located within the same State, many of them public institutions created by the same sovereign." *National Collegiate Athletic Ass'n v. Tarkanian,* 488 U.S. 179, 194, n. 13, 109 S.Ct. 454, 463, n. 13, 102 L.Ed.2d 469 (1988) (citing *Clark v. Arizona Interscholastic Ass'n,* 695 F.2d 1126 (9th Cir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 79, 78 L.Ed.2d 90 (1983) and *Louisiana High School Athletic Ass'n v. St. Augustine High School,* 396 F.2d 224 (5th Cir.1968)).

This Court agrees with the analysis in *Tarkanian.* Thus, Defendants' reliance upon cases involving the NCAA is misplaced. In *Brewer v. Purvis,* 816 F.Supp. 1560, 1575 (M.D.Ga.1993), *aff'd,* 44 F.3d 1008 (11th Cir. 1995), *cert. denied,* 514 U.S. 1111, 115 S.Ct. 1965, 131 L.Ed.2d 855 (1995), the court held that the Georgia High School Association and its employee were state actors for purposes of the Fourteenth Amendment, noting that "[t]raditionally, courts have found that high school athletic associations are state actors." The court distinguished *Tarkanian* because it involved the NCAA, specifically noting footnote 13 in that case, and stated: "Thus, an athletic association whose membership is

---

6. Defendants erroneously stated at oral argument that *Graham* was based solely on a "designation" theory.

7. TSSAA made this admission at oral argument.

predominated by institutions created by the same sovereign is a state actor." *Id.* Also distinguishing *Tarkanian* on that same basis are *Habetz v. Louisiana High School Athletic Ass'n*, 915 F.2d 164, 166–67 (5th Cir.1990) and *Libby v. South Inter-Conference Ass'n*, 728 F.Supp. 504 (N.D.Ill.1990), *aff'd*, 921 F.2d 96 (7th Cir.1990).

In 1989, the Sixth Circuit, relying exclusively upon *Graham v. NCAA*, held that the Ohio High School Athletic Association ("OHSAA") did not act under color of state law. *Burrows v. Ohio High School Athletic Ass'n*, 891 F.2d 122 (6th Cir.1989). The *Burrows* court relied upon a case involving a national association, not a state association, and the opinion does not mention *Tarkanian* or *Yellow Springs*[8] at all. The Court finds that *Burrows* does not dictate the outcome of this case based on the facts presented here.[9]

In *Clark* and *St. Augustine*, the cases cited by the Supreme Court in *Tarkanian*, the courts listed numerous factors which indicated that the association's functions were "intertwined" with the state's actions: (1) composition of the association's membership primarily public schools; (2) public school principals—state officers, state paid and state supervised—comprise association leadership and play substantial role in determining and enforcing policies and regulations; (3) association funds come largely from public athletic events, the great majority of which are held at state-owned and state-supplied facilities; (4) paid staff of association covered by state retirement plan; (5) association exercises wide control over scheduling, participation in and conduct of athletic events of public schools; (6) association sets and enforces eligibility rules and limits numbers of games public schools may play; (7) association has power to keep pub-

lic schools from competing against other schools; (8) association has power to investigate, discipline and punish member schools; and (9) rules and regulations of association bind all public schools, although any school may withdraw from association at any time. *See Clark*, 695 F.2d at 1128 and *St. Augustine*, 396 F.2d at 227–228.[10] Almost identical factors are present in this case.

The Court finds overwhelming evidence of the symbiotic relationship between TSSAA and the public, state-controlled school system in this case. For example, the stated purpose of TSSAA is "to stimulate and regulate the athletic relations of the secondary schools in Tennessee." TSSAA Constitution, Section 2. TSSAA exercises wide control over scheduling, participation in and conduct of athletic events in public schools. TSSAA Bylaws, Arts. I, II, III and IV. TSSAA prescribes uniform rules of play. *Id.*, Art. III, Section 8. TSSAA regulates the eligibility of public school students to participate in interscholastic athletics. *Id.*, Art. II. TSSAA admits it is the only organization providing these benefits to the public schools of Tennessee.

Officials for athletic contests at TSSAA schools must be selected from the official TSSAA list and paid TSSAA-set fees. TSSAA Bylaws, Art. IV, and Docket No. 68, Exhibit A (June 11–12, 1997 TSSAA minutes). The TSSAA also sets the ticket prices for all regional and state tournament games. *Id.*

The TSSAA has the power to investigate and sanction schools which violate its rules. TSSAA Bylaws, Art. 1, Section 6. Thus, public schools, state agencies, are subject to TSSAA discipline. TSSAA can levy mone-

---

8. This omission is significant since the court had earlier held, in *Yellow Springs*, that the same athletic association (OHSAA) was a state actor. There is no explanation for the apparent conflict with the previous decision.

9. In *Graham v. TSSAA*, Judge Edgar distinguished *Burrows* by citing the Tennessee Board of Education's greater involvement in the association's affairs. *Graham*, p. * 5. This Court agrees. *See also Rhodes v. Ohio High School Athletic Ass'n*, 939 F.Supp. 584, 590–91 (N.D.Ohio 1996), in which an Ohio district court,

after *Burrows*, held that the OHSAA was a state actor, and *Horner v. Kentucky High School Athletic Ass'n*, 43 F.3d 265, 272 (6th Cir.1994), also decided after *Burrows*.

10. In *Poret v. Louisiana High School Athletic Ass'n*, 1996 WL 169241 (E.D.La.1996), the court, noting the "new test" of *Blum*, found that, even under a "fairly attributable" standard, *St. Augustine* (cited above) is still controlling and the LHSAA is a state actor for purposes of Section 1983. *Id.*, p. * 2 (citing *Graham* and *Crocker*).

tary fines against the public schools of Tennessee.

In addition, the TSSAA has the power to keep schools from competing against other schools. *Id.*, Art. III. Its rules and regulations bind all public high schools in Tennessee that participate in interscholastic athletics.

TSSAA rules provide that public school principals and coaches submit certain reports to the association on a regular basis. TSSAA Bylaws, Arts. III and IV. In fact, the TSSAA Bylaws provide that principals—state-paid, state-supervised, public officials—are responsible to the association in all matters pertaining to athletic relations of their schools.[11] *Id.*, Art. III, Section 8. State employees, therefore, are accountable to the TSSAA. Initial responsibility for assuring compliance with all TSSAA rules and regulations is placed in the hands of the principals. *Id.*, Art. III, Section 9 and Art. IV, Section 8.

A substantial portion of TSSAA's annual revenue comes from tournament receipts from athletic tournaments of member schools. TSSAA Bylaws, Art. III, Section 17; Local Rule Response (Docket No. 46), ¶ 24. The majority of athletic contests between member schools are played in public, state-owned facilities. *Id.*, ¶ 25. The TSSAA directly dictates the parameters of all post-season play for public schools. TSSAA Bylaws, Art. III.

Employees of TSSAA, including Defendant Carter, are covered by the State retirement system and, by statute, are included in the definition of "teachers" for that purpose. Tenn.Code Ann. § 8–35–118; Local Rule Response, ¶ 21.

For a school to be member of TSSAA, its coach must have a Tennessee State teaching license, must be a full-time employee of the Board of Education and must be paid entirely from funds approved by the Board of Education or the governing board of the school. TSSAA Bylaws, Art. III, Section 7.

TSSAA admits that interscholastic athletics are intricately connected to the educational process. For example, the Executive Director of TSSAA stated, in a letter to Plaintiff: "High school athletics is a part of the total educational program." *See* Ex. D to Docket No. 24. In addition, the first Article of the TSSAA Constitution provides:

> Recognizing that the primary objective of all secondary schools is to educate youth, the TSSAA aims to co-ordinate the athletic and scholastic programs. The athletic field and the gymnasium are classrooms in which teaching is foremost in the development of character, integrity, sportsmanship, and team work. Although the athletic program is associated primarily with physical education and the scholastic program with mental education, one complements the other.

TSSAA Constitution, Art. 1, Section 2.

By state law, participation in interscholastic athletics and marching band may be substituted for the physical education graduation requirement. Tenn. Bd. of Education Rule 0520–1–3–.06. Thus, students get academic credit for TSSAA activities, and the TSSAA is therefore performing part of a public function, required by state law, as the court in *Kelley* found.

On July 29, 1994, Defendant Carter, Executive Director of TSSAA, appeared at a State Board of Education meeting, on behalf of TSSAA, to answer questions about TSSAA's lack of minority hiring. *See* Docket No. 66, attachment, p. 111. The minutes reflect the State Board's "overall concern that TSSAA reflect hiring practices which are the same as those expected for local schools." *Id.*, p. 112. At the September 29, 1994 meeting, Bob Baldridge, Associate Executive Director for TSSAA, appeared again to update the Board on TSSAA's employment practices. *Id.*, p. 128. Thus, the State Board of Education injected itself into the TSSAA's hiring practices as late as 1994.

The TSSAA connection to the State Board of Education is further demonstrated by the fact that the TSSAA treated all Board members to dinner and helped with the expenses

---

**11.** Although unnecessary to the decision in this case, this regulation, on its face, raises conflict of interest concerns.

of the Board's July 1991 retreat. *See* Docket No. 66, attachment, pp. 63 and 69.

Mr. Sailors stated in his Affidavit that "no member of the State Board of Education attends meetings either of the TSSAA Board of Control or Legislative Council." Docket No. 52, p. 3. Yet minutes of the TSSAA Board of Control and Legislative Council meetings reveal that statement to be utterly false, since State Board representatives, including Mr. Sailors himself, attended more than twenty TSSAA Board of Control or Legislative Council meetings from 1990 through 1997. *See* Exhibit A to Docket No. 68.

The minutes of the June 8, 1990 Board of Control meeting reveal that the State Board of Education representative is, in fact, an ex-officio member of the Board of Control. *Id.; see also* Docket No. 52, p. 2. Therefore, TSSAA cannot argue that representatives of the State attended these meetings simply as members of the public. Those minutes state the following: "At the present time, there are three ex-officio members serving on the Board of Control and Legislative Council. They are representatives of the State Board of Education, the State Schools Boards Association, and the State Department of Education." Docket No. 68, Ex. A. So, not only is the State Board of Education represented on the TSSAA Board of Control and Legislative Council; the State Department of Education is represented within the governance of TSSAA as well. It is also significant that State representatives continued to attend TSSAA meetings as ex-officio members even after the "delegation" rule was changed in 1995. Docket No. 68, Ex. A.

Therefore, regardless of how the TSSAA denominates itself as an organization, or how it characterizes its relationship with its member schools, "it is abundantly clear that the association's very existence is entirely dependent upon the absolute cooperation and support of the public school systems" of the State of Tennessee. *Haas v. South Bend Community School Corp.*, 259 Ind. 515, 289 N.E.2d 495, 498 (1972) ("The enforcement of the rules promulgated by the IHSAA and adopted by the member schools may have a substantial impact upon the rights of students enrolled in these tax supported institutions, and we conclude, therefore, that the administration of interscholastic athletics by the IHSAA should be considered to be 'state action' within the meaning of the Fourteenth Amendment.").

The supervision and regulation of interscholastic athletics in secondary schools in Tennessee is provided by the TSSAA, in joint participation with the State. Certainly the conduct of the TSSAA and the State meet the "significant encouragement" and "fairly attributable" tests of *Blum.*

As the court noted in *Barnhorst v. Missouri State High School Activities Ass'n,* 504 F.Supp. 449 (W.D.Mo.1980):

> It is beyond cavil that education is a traditional function of the state.... Extracurricular activities are an important component of an education in today's modern society. The close identification of the functions served by MSHSAA with the State's provision of education to all children of school age (not otherwise receiving a private or parochial education) is a sufficient nexus to transmute the challenged rule of MSHSAA into "state action" subject to the constitutional strictures of the Fourteenth Amendment of the United States Constitution.

*Id.,* p. 457.

The close identification of the TSSAA with the State's provision of education is a sufficient nexus to find state action in this case. Accordingly, the Court finds that the actions of the TSSAA, a state athletic association, are so intertwined with the State that they constitute "state action" for purposes of Section 1983. *See also Clark,* 695 F.2d at 1128; *Dennin v. Connecticut Interscholastic Athletic Conf., Inc.,* 913 F.Supp. 663, 671 (D.Conn.1996), *judgment vacated on other grounds* (mootness), 94 F.3d 96 (2d Cir.1996); *Force v. Pierce City R–VI School Dist.,* 570 F.Supp. 1020, 1030 (W.D.Mo.1983); *Beck v. Missouri State High School Activities Ass'n,* 837 F.Supp. 998, 1001 (E.D.Mo.1993), *judgment vacated on other grounds* (mootness), 18 F.3d 604 (8th Cir.1994); *Mississippi High School Activities Ass'n. Inc. v. Coleman,* 631 So.2d 768, 774 (Miss.1994).

## V. *First Amendment Freedom of Speech*

### A.

Brentwood Academy contends that the TSSAA Recruiting Rule violates its First Amendment right of freedom of speech. Plaintiff, in particular, emphasizes that by prohibiting school representatives from contacting a student before the student has attended the representative's school for three days, the Recruiting Rule violates the First Amendment on its face, and as applied in this case. Defendants contend that the Rule is a valid time, place and manner restriction. For the reasons described herein, the Court finds that the TSSAA Recruiting Rule violates the First Amendment on its face, and as applied to Brentwood Academy.

The Recruiting Rule appears at Article II, Section 21 of the TSSAA By–Laws, and consists of the "main" Rule, followed by five sets of questions and answers, and "Guidelines For Understanding The 'Recruiting Rule' and Understanding 'What is Undue Influence.'" The main Rule prohibits the use of "undue influence on a student (with or without an athletic record), his or her parents or guardians of a student by any person connected, or not connected, with the school to secure or to retain a student for athletic purposes."

In answer to Question 1, the phrase "undue influence" is defined as: "exceeding what is appropriate or normal and offering an incentive or inducement to a student with or without an athletic record." The phrase "appropriate or normal" is not defined in the Rule.

The answer to Question 3 following the Rule attempts to specifically regulate the conduct of coaches. It provides that a "coach may not contact a student or his or her parents prior to his enrollment in the school." The prohibition applies "whether or not [the student has] an athletic record."

"Contact" is not defined in the answer to Question 3, or anywhere else in the Rule. In that regard, paragraph six of the Guidelines provides that "[a]ny meeting with coaches regarding athletes or prospective athletes or their families should be at the request of the family to the individual(s) responsible for admissions and should take place at the school." It is not clear whether a member of the coaching staff may "contact" a student who has, at some time prior to enrollment, requested to speak with him or her. *See* Deposition of Robert Lee Baldridge, III, at 81–83 (attachment to Docket No. 80)(coach may talk with student if student has requested to talk with coach).[12]

"Enrolled" is also undefined in the answer to Question 3. The term is used again, however, in the second example in the answer to Question 4, which prohibits: "Discussion of financial aid based on need with any prospective student/athlete by any member of the coaching staff until the student has enrolled in school (attended 3 days of school) ..." The TSSAA has taken the position that this sentence clearly indicates that the term "enrollment," as it is used throughout the Rule and explanations, requires that the student have attended at least three days of school. (Defendants' Response To Motion For Partial Summary Judgment, at 95–96 (Docket No. 45)). Based on this interpretation by the TSSAA, the restriction under Question 3 prohibits a coach from "contacting" *any* student or parent until that student has attended the coach's school for three days.

Other explanations following the Rule specifically prohibit "initial contact or prearranged contact" by coaches or other representatives of the school with "prospective student–athletes." Specifically, three examples under Question 4 prohibit:

3. Any initial contact or prearranged contact by a member of the coaching staff or representative of the school and a prospective student/athlete enrolled in any member school except where there is a definite feeder pattern.

4. Any initial contact or prearranged contact by a member of the coaching staff or

---

12. Indeed, TSSAA Assistant Executive Director Robert Baldridge has testified that a member school does not violate the Rule by sending letters to, or calling, students who have made an "initial contact" with the school—a position contrary to the one taken by the TSSAA in penalizing Plaintiff for sending the Spring Practice Letter and calling students who had already signed enrollment contracts with the school. (Baldridge Deposition, at 83–84).

representative of the school and a prospective student/athlete in the seventh grade and above at any non-member school except where there is a definite feeder pattern involving the schools.

Public high schools may contact public feeder schools (elementary, middle school, junior high school) where there is a definite feeder pattern. Private or parochial schools may contact private schools (elementary, middle school, junior high school) where there is a definite feeder pattern.

Private or parochial schools may not contact students enrolled at the public schools. Public schools may not contact students enrolled at the private schools.

5. Any contact between a member of the coaching staff or representative of the school and prospective student/athletes prior to, during, or after contests at elementary schools, middle schools, and junior high schools except where there is a definite pattern.

"Feeder pattern" is not defined in the Rule, but the parties have stipulated that the Plaintiff has no schools in its feeder pattern. (Defendants' Local Rule 8(b)(7)(c) Response, ¶ 37 (Docket No. 46)).[13] Based on these examples, any school representative, including a member of the coaching staff, is prohibited from making an "initial contact" with prospective student athletes outside the "feeder" pattern for *any* reason until the student is enrolled at the school.

Plaintiff contends these restrictions on contact by schools violate the First Amendment.

**B.**

The principle underlying the Supreme Court's First Amendment jurisprudence is that "each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broadcasting System, Inc. v. Federal Communications Commission,* 512 U.S. 622, 114 S.Ct. 2445, 2458, 129 L.Ed.2d 497 (1994).

Laws and regulations that "stifle[ ] speech on account of its message . . . pose the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion." *Id.* These restrictions " 'rais[e] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace.' " *Id.* (quoting *Simon & Schuster, Inc. v. Members of State Crime Victims Bd.,* 502 U.S. 105, 112 S.Ct. 501, 508, 116 L.Ed.2d 476 (1991)).

■ Laws that regulate the content of the message in this way are subjected to the "most exacting scrutiny." *Turner Broadcasting,* 114 S.Ct. at 2459. To justify those laws, the government must show that they serve a compelling interest, and are narrowly drawn. *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 107 S.Ct. 1722, 1729, 95 L.Ed.2d 209 (1987); *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707 (1978). To be "narrowly drawn," the law must be the "least restrictive means" to further the government's articulated interest. *Sable Communications of California, Inc. v. Federal Communications Commission,* 492 U.S. 115, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989).

■ Defendants contend that the Recruiting Rule's prohibition on contact with prospective students is not an attempt to stifle speech, but is a valid time, place and manner restriction. In order to be analyzed as a time, place, and manner restriction, the regulation must be content-neutral. *Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989). If the regulation is content-neutral, it is subject to "intermediate" scrutiny: it must be narrowly tailored to serve a significant governmental interest, and it must leave open ample alternative channels for communication of the information. *Id.* The means chosen need not be the least restrictive, but may not "burden substantially more speech than is

---

**13.** Defendants suggest that the coach at Brentwood Academy can take advantage of the feeder school exception by talking with students who are in the first through sixth grade at the school. But Defendants have not suggested why they should be allowed to withdraw their stipulation. In any event, no reasonable person would interpret the term "feeder school" to mean the first six grades of the *same* school.

necessary to further the government's legitimate interests." *Ward,* 109 S.Ct. at 2757–58.

■ In determining whether a regulation is content-neutral, the "government's purpose is the controlling consideration." *Ward,* 109 S.Ct. at 2754. A regulation that serves purposes unrelated to the content of the message is deemed content-neutral, even if it has an incidental effect on certain messages or speakers. *Id.* For example, a government may regulate the level of noise emitted by a sound truck, without regard to the message conveyed by the sound truck, to further its interest in protecting citizens from unwelcome noise. 109 S.Ct. at 2756–57. If the interest to be served by the regulation is based on the listeners' reaction to the speech, however, the purpose of the regulation is not content-neutral. *Forsyth County, Georgia v. The Nationalist Movement,* 505 U.S. 123, 112 S.Ct. 2395, 2403, 120 L.Ed.2d 101 (1992). The Court finds that the Recruiting Rule ban is content-based because the interests asserted by the Defendants to support the ban focus on the content of the message and the effect of the message on the listener.

### C.

Defendants assert two interests supporting enactment of the Recruiting Rule: ensuring that athletes and non-athletes are treated alike; and preventing the exercise of undue influence on the student-athlete. (Defendant's Response To Motion For Partial Summary Judgment, at 73–75, 79 (Docket No. 45)). Thus, in enacting the ban, the TSSAA was apparently concerned that schools would be more interested in attracting student-athletes than other students, and consequently, school representatives would attempt to "unduly" influence these student-athletes to attend. Thus, the ban was purportedly enacted to prevent student-athletes from being subjected to the content of the message being conveyed by public and private school representatives outside the student's feeder pattern. The TSSAA's purpose in enacting the ban, then, indicates that the ban is not content-neutral.[14] Thus, Defendants must show that the ban is supported by a compelling governmental interest and is narrowly drawn. *Arkansas Writers' Project, Inc.,* 107 S.Ct. at 1729; *Bellotti,* 98 S.Ct. at 1421.

■ The Court recognizes that the State has a compelling interest in ensuring that its children obtain a high quality education so that they may become productive, contributing members of society. That education may include a curriculum that exposes the student to a wide variety of academic subjects, interscholastic athletics, and extracurricular activities.[15] Ensuring that students maintain an appropriate balance between these activities and their "core" academic work is also a legitimate interest of the government. To that extent, the first interest asserted by Defendants has superficial appeal.

That interest is referenced in the Guidelines which follow the Recruiting Rule:

2. One key is not treating 'athletes' or 'prospective athletes' any differently than students who are not athletes.

3. Students should be seen as students and not singled out based on their potential athletic ability . . .

\* \* \* \* \* \*

7. High school athletics is not the same as colleges recruiting high school athletes for college athletics. High school athletics exist for an entirely different reason. High school coaches should not view 12, 13, 14 year-old students in the same manner as college coaches view high school seniors.

8. Administrators and coaches must realize that they have more responsibilities than the general public to understand the

---

14. Even if the ban were content-neutral, it still would not be a valid time, place, and manner restriction because, as discussed more fully below, the ban burdens substantially more speech than is necessary to prevent harm to student-athletes. *See also Edenfield v. Fane,* 507 U.S. 761, 113 S.Ct. 1792, 1801, 123 L.Ed.2d 543 (1993) ("Assuming that a flat ban on commercial solicitation could be regarded as a content-neutral time, place, or manner restriction on speech, a proposition that is open to serious doubt," the ban does not "serve a substantial state interest in 'a direct and effective way.' " (citations omitted)).

15. Students may receive academic credit for interscholastic athletics. Tenn. Bd. of Ed. Rule 0520–1–3–.06.

purpose of high school athletics, the principles behind the TSSAA rules, etc., and to maintain a level of understanding and purpose when dealing with the general public and students.

To the extent that singling out a student based on his or her athletic ability would harm that student,[16] the State would have an interest in preventing that harm from occurring. Certainly, the State would have an interest in preventing a student's athletic abilities or activities from resulting in an unfair advantage or an unfair disadvantage to the student. Both situations could affect the student's ability to benefit fully from his education.[17] Thus, to the extent that Defendants are asserting an interest in ensuring that athletics do not interfere with a student-athlete's ability to obtain a high quality education, they have asserted a compelling state interest.

Defendants also assert that the Recruiting Rule ban is designed to prevent "undue influence." Under Tennessee law, a plaintiff who seeks to invalidate a will based on undue influence on the testator must show "that one person, by threats, coercion or importunities, so exhausted the will of the other person to resist that the act taken by the weaker was not his or her own act but that of the person exercising the undue influence." *Bills v. Lindsay,* 909 S.W.2d 434, 440 (Tenn.Ct.App. 1993). A similar showing must be made to rescind a conveyance or a contract. *See, e.g., Fritts v. Abbott,* 938 S.W.2d 420, 421 (Tenn. Ct.App.1996) (plaintiff must show that the weaker party made the conveyance while under the domination and control of the stronger party). Limited by these definitions, the Court agrees that the prevention of "undue influence" on a student is a valid state interest because conduct constituting "undue influence" could harm the student.

In other words, the TSSAA has a substantial interest in preventing a student from being threatened, coerced, or harassed.

On the other hand, the TSSAA does not have a legitimate interest in preventing a school, public, private or parochial, from providing information in an effort to persuade potential students that the educational experience at that school is superior to that to be gained at another school.[18] In other words, it is simply not the business of the State to stifle competition among schools for students, whether those students are athletes, musical prodigies, or math geniuses. In the competition among schools for students, the First Amendment prohibits the State from favoring one side of the debate by suppressing the speech of the other. *Turner,* 114 S.Ct. at 2458–59; *Bellotti,* 98 S.Ct. at 1420–21. The TSSAA cannot control school choice through censorship.

Having determined, however, that Defendants have a legitimate interest in protecting student-athletes from the specific harms identified above, the Court must determine whether the Recruiting Rule's ban is narrowly drawn to accomplish those goals. The answer is clearly no. The interests identified by Defendants are, at best, only marginally promoted by the ban, and "could be sufficiently served by measures less destructive of First Amendment interests." *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 836, 63 L.Ed.2d 73 (1980).

There is absolutely no evidence in the record that the Recruiting Rule ban was enacted in response to evidence that student-athletes were being harmed as a result of initial contact by school representatives, including the school's coaching staff. *See Edenfield,* 113 S.Ct. at 1800–01 (failure to present stud-

---

**16.** There is no evidence in the record to support the conclusion that singling out students based on their school activities is harmful. Singling out talented student-athletes may well be beneficial rather than harmful.

**17.** The Court is not persuaded, however, that the State would have an interest in ensuring that students with certain talents are treated exactly the same as every other student. Pursuing this goal to its logical extreme would prevent schools from allowing talented orators to participate on

the debate team, or from allowing talented musicians to play in the school band. By offering these extracurricular activities, the State has recognized that developing a student's particular talent enhances the quality of that student's educational experience.

**18.** The State's interest, in fact, is the reverse. The State has a profound interest in students making informed choices about education.

ies or anecdotal evidence substantiating State's allegations of harm belies government's argument that restriction directly and materially alleviates that harm). *See also Ibanez v. Florida Dep't of Business and Professional Regulation. Board of Accountancy,* 512 U.S. 136, 114 S.Ct. 2084, 2091, 129 L.Ed.2d 118 (1994)("[w]e have never sustained restrictions on constitutionally protected speech based on a record so bare as the one on which the Board relies here.") It is difficult to imagine that a student-athlete would be harmed simply by hearing that a school outside his zone would be interested in him or her. It is difficult to imagine that a student-athlete who did not have the financial means to attend a private or parochial school would be harmed simply by an offer of financial aid that would allow him to attend the school.

There is also no evidence in the record that the ban prevents athletes from obtaining an "unfair" advantage over other students. In fact, the ban has the result of penalizing athletes by prohibiting them from being approached with offers of educational opportunities when schools may freely approach, and make offers to, students with other talents.[19] Student-athletes are being punished, rather than favored, for their talents.

Furthermore, Defendants have not explained the purpose for the feeder school exception. If conveying information to student-athletes about opportunities to attend out-of-zone schools is harmful to these students, the logical conclusion is that these students would also be harmed through recruiting by representatives of "feeder schools." The TSSAA cannot have it both ways.

Certainly, the TSSAA's legitimate interest in preventing harm to student-athletes can be better served by means less intrusive than the Recruiting Rule ban. For instance, fraudulent conduct and intimidation could be prohibited, and the TSSAA could require parental involvement, if necessary. *See Schaumburg,* 100 S.Ct. at 836–37; *Riley v.*

*National Federation of the Blind of North Carolina, Inc.,* 487 U.S. 781, 108 S.Ct. 2667, 2676, 101 L.Ed.2d 669 (1988). The Court agrees with Plaintiff that the Rule's ban has the effect of preventing *any* influence on a student, not just "undue" influence. The ban is simply not the "least restrictive means" for preventing harm to student-athletes. The TSSAA needs to go back to the drawing board and start over.

Thus, the Court concludes that the Recruiting Rule ban cannot be applied in a valid manner, and is therefore, facially unconstitutional. *See, e.g., Members of City Council of City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 2124, 80 L.Ed.2d 772 (1984).

■ The ban also violates the First Amendment as applied to the facts in this case because there is no evidence that penalizing the conduct at issue here even remotely furthered the legitimate interests identified above. The letter sent by Coach Flatt invited students who had already signed enrollment contracts with the school to Spring football practices, advised the students that they were not required to attend the practices, and set forth the schedule for practices. The phone calls Coach Flatt made after sending the letter were simply to reiterate to the recipients that they should not participate in practices if their participation conflicted with activities at the schools they were currently attending.

There is no evidence in the record to suggest that these students were, or were likely to be, harmed by receiving information about Plaintiff's Spring football practice. The Spring Practice Letter, and follow-up telephone calls, could not have constituted "undue influence" of the students to attend Brentwood Academy. The students who received the letters and calls had already contractually agreed to attend the school. Whatever influence the letters and calls had was "due," rather than "undue," given the legitimate need for a school to communicate such information to its students.

---

**19.** In that regard, the Court notes that listeners, as well as speakers, have First Amendment interests that deserve protection, interests that may be asserted by those who wish to reach those listen-

ers. *See, e.g., Virginia Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 1823 n. 15, 48 L.Ed.2d 346 (1976).

Furthermore, Defendants have admitted that the Recruiting Rule does not prohibit incoming students from participating in spring football practice at a school they plan to attend the next fall.[20] Therefore, the TSSAA has prohibited speech with regard to conduct it recognizes as lawful under the regulations. Defendants have asserted no legitimate justification for penalizing Plaintiff's communication about this admittedly legal activity.

■ Defendants also argue that the restriction is justified because the State may specify those who are allowed to speak under certain circumstances, citing *Minnesota State Board For Community Colleges v. Knight*, 465 U.S. 271, 104 S.Ct. 1058, 79 L.Ed.2d 299 (1984); *Cornelius v. NAACP Legal Defense Ed. Fund*, 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); and *Perry Education Ass'n v. Perry Local Educator's Ass'n*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). These cases do not advance the analysis here because they all involve the extent to which the government may limit access to public property, or may limit access to government officials or employees by those wishing to express their views. The ban in this case does not limit access to public property or public officials or employees. It limits access by certain speakers to certain potential listeners. Indeed, by restricting the speech of coaches, it limits the most informed speakers on the subject of athletics. As discussed above, the First Amendment is much less tolerant of the restrictions involved here. *See Bellotti*, 98 S.Ct. at 1420 (The government is "constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue.")

### D.

Defendants also argue that even if the Rule's ban is content-based, it should be analyzed under the more relaxed scrutiny applied to "commercial speech" under the First Amendment. The Supreme Court has explained that " 'the test for identifying commercial speech' " is whether the communication involves "the proposal of a commercial transaction." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 113 S.Ct. 1505, 1513, 123 L.Ed.2d 99 (1993)(quoting *Board of Trustees of State University of N.Y. v. Fox*. 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)).

The Court is not persuaded that the ban in this case should be characterized as regulating only commercial speech. The ban is not limited to a school's advertisements and/or solicitations, but covers all speech by a school representative with a student until the student has attended the representative's school for three days. Indeed, as Plaintiff points out, the communication for which Plaintiff was punished in this case did not involve solicitation or recruiting, but merely conveyed information about spring football practice to students who had signed enrollment contracts with the school. Furthermore, the ban also applies to coaches of public schools who seek to contact students attending schools that are not "feeder schools." Since public school students do not pay tuition, a student's enrollment in a particular public school would not constitute a "commercial" transaction. By the same token, it is not at all clear that a student's enrollment in a private school that provided a full scholarship to the student would constitute a "commercial" transaction. Thus, the Rule's ban does not limit purely commercial speech.[21]

■ Even if Defendants are correct in their characterization of the speech involved here, however, the ban does not survive even the more relaxed scrutiny accorded commercial speech regulations. Regulation of commercial speech is subjected to "intermediate" scrutiny under a framework set forth in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980).

---

20. The Court notes the absurdity of TSSAA's position that coaches cannot contact students until they attend school for three days, but these same students can attend spring practice. How can a coach hold a practice with students that he or she cannot contact?

21. As the Supreme Court has pointed out, speech does not retain its commercial character "when it is inextricably intertwined with otherwise fully protected speech." *Riley*, 108 S.Ct. at 2677.

*Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 115 S.Ct. 2371, 2375–76, 132 L.Ed.2d 541 (1995).[22] Under *Central Hudson*, commercial speech that concerns a lawful activity and that is not misleading may be regulated if the government demonstrates that:[23] (1) it has a substantial interest in support of its regulation; (2) the restriction on commercial speech "directly and materially advances that interest;"[24] and (3) the restriction is " 'narrowly drawn.' "[25] *Florida Bar*, 115 S.Ct. at 2376. Unlike rational basis review, this intermediate level of scrutiny does not permit the court "to supplant the precise interests put forward by the State with other suppositions." 115 S.Ct. at 2376.

■■■ As discussed above, the Court recognizes that the State has a compelling interest in preventing conduct that is harmful to a student-athlete. Also, as explained above, however, the ban does not directly and materially advance that interest, nor is it narrowly drawn. Accordingly, even if the ban could be construed as involving commercial speech, it would still violate the First Amendment.

Defendants cite *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978) to support their argument that "a prohibition on the exercise of 'undue influence' in the context of commercial speech has been upheld under the First Amendment." (Defendants' Response To Motion For Partial Summary Judgment, at 79) (Docket No. 45). In *Ohralik*, the Ohio Supreme Court disciplined an attorney for approaching an 18–year old accident victim in the hospital, offering to represent her, and during a later visit, obtaining· her signature on a contingent fee agreement. 98 S.Ct. at 1915–16. The attorney visited another victim of the accident, also 18–years old, at home and also secured her signature on a contingent fee agreement. *Id.* Ohralik was disciplined for violating a rule prohibiting a lawyer from recommending himself or his associates to one who has not sought his advice, and a rule that prohibits the acceptance of employment by a lay person to whom the attorney has given unsolicited advice. 98 S.Ct. at 1917 n. 9. Neither of these rules used the phrase "undue influence."

The *Ohralik* Court held that the State does not violate the First Amendment by disciplining a lawyer "for soliciting clients in person, for pecuniary gain, under circumstances likely to pose dangers that the State has a right to prevent." 98 S.Ct. at 1915. In reaching its decision, the Court determined that the State had a legitimate interest in "preventing those aspects of solicitation that involve fraud, undue influence, intimidation, overreaching, and other forms of 'vexatious conduct.' " 98 S.Ct. at 1921.

---

**22.** Since *Virginia Board of Pharmacy*, 96 S.Ct. at 1817, the Court has held that accurate and non-misleading commercial messages are protected by the First Amendment. Only false, deceptive or misleading commercial speech may be banned. *Ibanez*, 114 S.Ct. at 2088. Defendants do not contend that the ban is justified because it reaches only unprotected false, deceptive or misleading speech.

**23.** It is well established that the party seeking to uphold a restriction on protected commercial speech has the burden of justifying it. *Ibanez*, 114 S.Ct. at 2088 n. 7. As the Supreme Court stated in *Ibanez*, 114 S.Ct. at 2089:

The State's burden is not slight; the 'free flow of commercial information is valuable enough to justify imposing on would-be regulators the costs of distinguishing the truthful from the false, the helpful from the misleading, and the harmless from the harmful.'

(quoting *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 105 S.Ct. 2265, 2279, 85 L.Ed.2d 652 (1985)).

**24.** Under the second prong of the *Central Hudson* test, Defendants must show that the regulation directly and materially advances the articulated interests. *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 116 S.Ct. 1495, 1509, 134 L.Ed.2d 711 (1996). Defendants may not rely on speculation and conjecture in making this showing, but "must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield*, 113 S.Ct. at 1800–01. In that regard, the Court has explained that "broad prophylactic rules may not be so lightly justified if the protections afforded by commercial speech are to retain their force." · *Zauderer*, 105 S.Ct. at 2281.

**25.** In *Fox*, 109 S.Ct. at 3034–35, the Court made it clear that commercial speech analysis does not require that the regulation meet the "least restrictive means test." Instead, there must be a "fit" between the legislature's ends and the means chosen to accomplish those ends. *Id. See also 44 Liquormart*, 116 S.Ct. at 1509.

As explained above, this Court agrees that the TSSAA has an interest in preventing students from harmful solicitations involving fraud, undue influence, intimidation, or overreaching, but Defendants have not shown that the Recruiting Rule ban properly accomplishes that goal. As the Supreme Court explained in a more recent case, this goal does not justify blanket bans on all personal solicitations: "the constitutionality of a ban on personal solicitation will depend upon the identity of the parties and the precise circumstances of the solicitation." *Edenfield,* 113 S.Ct. at 1802. In striking down a ban on in-person solicitation by Certified Public Accountants, the Court in *Edenfield* made it clear that the *Ohralik* holding was limited: "*Ohralik*'s holding was narrow and depended upon certain 'unique features of in-person solicitation by lawyers' that were present in the circumstances of that case." *Id.* (quoting *Zauderer,* 105 S.Ct. at 2277). The "unique features" of the in-person solicitation in *Ohralik* were that a lawyer, who "is trained in the art of persuasion," personally solicits an "unsophisticated, injured, or distressed lay person" and seeks the person's immediate acceptance of a retention agreement. *Id.*

Unlike *Ohralik,* there is no evidence in the record that a student's parents, who must make the ultimate decision about which school their child will attend, would be vulnerable to, and oppressed by, school representatives, or that there would be pressure to make a decision on the spot. *See Edenfield,* 113 S.Ct. at 1803 ("... *Ohralik* in no way relieves the State of the obligation to demonstrate that it is regulating speech in order to address what is in fact a serious problem and that the preventative measure it proposes will contribute in a material way to solving that problem.")

Moreover, the facts in this case are that the Spring Practice Letter, and follow-up calls, all went to students who had already contractually agreed to attend Brentwood Academy. The students and their parents had already selected Brentwood Academy, and therefore, there was no opportunity for solicitation, much less undue influence, as in *Ohralik.* Accordingly, *Ohralik* does not support the constitutionality of the ban involved here.

### E.

Even if the Recruiting Rule ban were not content-based, it would still run afoul of the First Amendment for another reason. By using the phrase "appropriate or normal" to define the already imprecise term "undue influence," the TSSAA retains unbridled discretion to penalize those expressing points of view with which it disagrees. *Forsyth County,* 112 S.Ct. at 2401–02.[26] Indeed, the TSSAA invoked these vague terms in finding Plaintiff in violation of the Recruiting Rule, but did not explain how the students involved were harmed. *See* Exhibit A to Complaint (Docket No. 1)("This entire process [sending letters and calling those who had signed enrollment contracts] is seen as beyond what is normal and appropriate and is undue influence.")

The word "appropriate" is defined in Webster's Third New International Dictionary as "specially suitable." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 106 (1993). The word "normal" is defined as "according to, constituting, or not deviating from an established norm, rule, or principle." *Id.* at 1540. Neither of these definitions sheds any light on how to determine the "established norm," or to whom the conduct must be "specially suitable." Nor do they add any precision to the phrase "undue influence." Accordingly, the TSSAA is free to use the Recruiting Rule to arbitrarily suppress speech in violation of the First Amendment.[27]

---

**26.** That the TSSAA allows members to seek advice about how the Recruiting Rule will be interpreted does not eliminate the discretion it retains to apply those subjective terms in an arbitrary fashion.

**27.** Because the Court has determined that the Recruiting Rule is unconstitutional by violating the First Amendment, it is unnecessary to address Plaintiff's argument that the Rule also violates its substantive due process rights under the Fourteenth Amendment because it is void for vagueness. The Court is persuaded, however, that the terms "appropriate," "normal," and "undue influence" would also be unconstitutionally vague for purposes of the Fourteenth Amendment. These terms have "no settled usage or tradition of interpretation in law." *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 111

### F.

In summary, the Court has determined that the Recruiting Rule violates the First Amendment on its face and as applied, and that Plaintiff is entitled to summary judgment as to Count I. Defendants are hereby enjoined from any use of the Recruiting Rule.[28]

Having found the Recruiting Rule unconstitutional, all sanctions imposed by the TSSAA on Brentwood Academy pursuant to the August 23, 1997 letter from the TSSAA to Brentwood Academy (Exhibit G to Complaint (Docket No. 1)) are void and unenforceable. The sanctions imposed are not itemized by type of violation. Therefore, to ensure that the First Amendment is not violated, all sanctions must be set aside.

## VI. *Fourteenth Amendment: Procedural Due Process*

Plaintiff alleges, in Count III of its Complaint, that Defendants' actions have violated Plaintiff's Fourteenth Amendment rights to procedural due process. For purposes of its Motion for Partial Summary Judgment, Plaintiff argues two specific procedural due process rights which were allegedly violated by Defendants: (1) the right to a neutral, impartial and detached decision maker and (2) the right to confront and cross-examine adverse witnesses.

The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). Thus, the Court must first determine whether Plaintiff has been deprived of a property or liberty interest protected by the Constitution. Plaintiff asserts that it has property interests in both the fine assessed against it by Defendants and the contract rights to which it is entitled as a member of the TSSAA. Plaintiff further asserts that it has liberty interests in its reputation and opportunities for attracting students and raising funds for the school.

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits. These interests—property interests—may take many forms." *Id.*, 408 U.S. at 576, 92 S.Ct. at 2708. Property interests are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—

---

S.Ct. 2720, 2731, 115 L.Ed.2d 888 (1991). Consequently, the Rule fails to provide "fair warning" to those to whom it is directed, and is so imprecise as to present a real "danger[] of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972).

The Rule prohibits the use of "undue influence," and that phrase, by its very nature, requires further explanation. The TSSAA defines the phrase "undue influence" by raising and answering five sets of questions and promulgating guidelines. It is unclear if the explanations expand the scope of the Rule, or if the Rule limits the expansive prohibitions that follow it.

In any event, the first question and answer used to define "undue influence" only makes matters worse. The TSSAA defines "undue influence" as "exceeding what is appropriate or normal." The phrase "appropriate or normal" could not be more vague. The words "appropriate" and "normal" are among the most relative terms in the English language. "Appropriate" or "normal" compared to what?

These profound defects could perhaps be ameliorated if "appropriate or normal" was clearly defined. However, nowhere in the Rule is the phrase "appropriate or normal" defined. And yet, to further complicate matters, the TSSAA emphasizes the importance of the "appropriate or normal" standard by stating in its "Guidelines For Understanding The 'Recruiting Rule' and Understanding 'What Is Undue Influence:'"

> The major theme of the "recruiting rule" is not "initial contact." The major theme is "exceeding what is normal and appropriate." Initial contact can be a violation, but is only one of *many* things that can exceed what is normal and appropriate.

(emphasis added). Despite this statement, a major theme of the Recruiting Rule is vagueness.

The phrase "appropriate or normal" adds nothing to the definition of "undue influence," and is essentially meaningless. This vague Rule permits the TSSAA to engage in arbitrary and discriminatory enforcement—precisely, the claim made by Brentwood Academy in this case.

28. Thus, the Court need not address whether the Recruiting Rule violates substantive due process standards because it permits a member school to be punished for the conduct of someone unconnected with the member school.

rules of understandings that secure certain benefits and that support claims of entitlement to those benefits. *Id.,* 408 U.S. at 577, 92 S.Ct. at 2709.

The Court finds that Plaintiff, at a minimum, has a property interest, in the $3,000 fine assessed against it by the TSSAA.[29] Accordingly, the Court need not address, at this time, Plaintiff's other asserted constitutionally-protected rights. Plaintiff was entitled to the constitutional protections of procedural due process in this case.

▮ There are clear issues of fact, however, as to what process Plaintiff was given and whether that process was sufficient to meet the requirements of the Fourteenth Amendment. For example, there are genuine issues of material fact as to the extent of Defendant Carter's involvement and influence beyond the initial fact-finding investigation in this case. *See, e.g.,* Plaintiff's Response to Defendants' Statement of Undisputed Facts (Docket No. 70), ¶ 9. There are genuine issues of material fact as to whether the second appeal, to the TSSAA Board of Control, was truly a *de novo* review. *Id.,* ¶ 10. There are genuine issues of material fact as to whether bias or pre-judgment played any part in the decision making process. *Id.,* ¶¶ 9, 10, 15. There are genuine issues of material fact as to whether Plaintiff was given meaningful opportunities for confrontation and cross-examination of adverse witnesses. *Id.,* ¶¶ 11, 12; Defendants' Local Rule Response (Docket No. 46), ¶¶ 51, 95, 98.

Accordingly, Plaintiff's Motion for Partial Summary Judgment, on the issue of procedural due process, is DENIED.

## VII. *Defendants' Motion For Summary Judgment*

Also pending before the Court is Defendants' Motion for Summary Judgment (Docket No. 47), in which Defendants seek judgment on Plaintiff's federal and state law claims, with the exception of the antitrust claims.

Defendants contend that, because they are not "state actors," they are entitled to summary judgment on Plaintiff's constitutional claims. For the reasons stated above, the Court has found that Defendants are "state actors" and, therefore, Defendants' Motion for Summary Judgment on this issue is DENIED.

In addition, Defendants argue they are entitled to summary judgment on Plaintiff's state law claims. Those claims are set forth in Counts V and VI of Plaintiff's Complaint (Docket No. 1).

▮ In Count V, Plaintiff alleges a cause of action for equitable estoppel. Defendants contend that none of the acts alleged by Plaintiff are sufficient to create an equitable estoppel under Tennessee law. What both parties overlook is the fact that there is no cause of action for equitable estoppel under Tennessee law. *Val–Land Farms, Inc. v. Third Nat'l Bank in Knoxville,* 937 F.2d 1110, 1115 (6th Cir.1991). Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's purported claim of equitable estoppel (Count V) is GRANTED, and that claim is DISMISSED.

▮ In Count VI, Plaintiff alleges a cause of action for "unfair, unreasonable, arbitrary and oppressive action" in violation of Plaintiff's rights under state law. Defendants contend that they are entitled to summary judgment on this claim because their actions with regard to Plaintiff were conducted in good faith and that the Court should not interfere with the internal affairs of a voluntary association. Whether Defendants' actions were unfair, unreasonable, arbitrary and oppressive or whether they were taken in good faith all raise genuine issues of material fact. *See, e.g.,* Plaintiff's Response to Defendants' Statement of Undisputed Facts (Docket No. 70), ¶¶ 9, 10, 11, 12, 15. Whether TSSAA is a voluntary association is a disputed issue of fact. *Id.,* ¶¶ 2, 4, 44. The parties clearly disagree as well about what actions were taken, what motivated those

---

**29.** *See, e.g., G & G Fire Sprinklers, Inc. v. Bradshaw,* 136 F.3d 587 (9th Cir.1998) (subcontractor had due process property interest in money withheld by state); *Contractors Against Unfair Taxation Instituted on New Yorkers v. City of New York,* 1994 WL 455553 (S.D.N.Y.Aug.19, 1994) (property interest in money allegedly exacted for

payment of fines for traffic violations); *Jones v. Cowley,* 948 F.2d 1294 (10th Cir.1991) ("Certainly, there is no doubt that the $15 fine is a deprivation of a property interest."); *Murray v. Dosal,* 150 F.3d 814 (8th Cir.1998) (inmate has property interest in money received from outside sources).

696

actions, and what resulted from those actions. Accordingly, Defendants' Motion for Summary Judgment with regard to Count VI is DENIED.

VIII. *Conclusion*

For the reasons described above, Brentwood Academy's Motion for Partial Summary Judgment and for Permanent Injunction (Docket No. 27) is GRANTED in part and DENIED in part. Brentwood Academy's Motion is GRANTED as to its claim that TSSAA's Recruiting Rule violates the First Amendment on its face, and as applied to Brentwood Academy. Accordingly, Defendants are hereby enjoined from any use of the Recruiting Rule. All sanctions imposed by the TSSAA on Brentwood Academy pursuant to the August 27, 1997 letter from the TSSAA to Brentwood Academy (Docket No. 1, Ex. G) are void and unenforceable.

Defendants' Motion for Summary Judgment (Docket No. 47) is GRANTED in part and DENIED in part. Defendants' Motion is GRANTED as to Plaintiff's equitable estoppel claim and that claim is DISMISSED.

It is so ORDERED.